ROBERT L. PRITSKER & others[1] vs. DAVID BRUDNOY
& another.[2]

Norfolk.  May 5, 1983. — July 27, 1983.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Libel and Slander.*

When viewed in their context, statements by a radio talk-show host and
   recognized restaurant critic, during the course of a two-hour radio
   program presenting a critical evaluation of various restaurants, that
   the owners of a particular restaurant were "unconscionably rude and
   vulgar" and "pigs," constituted nonactionable statements of opinion.
   [778-783]

CIVIL ACTION commenced in the Superior Court on
November 29, 1976.

Motions for summary judgment were heard by *Garrity,* J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*John Taylor Williams (Molly H. Sherden* with him) for
the defendants.

*David C. Lucal* for the plaintiffs.

NOLAN, J.  The plaintiffs, Robert L. and Karen C. Prits-
ker (Pritskers) and Karenkir, Inc., claim that they were de-
famed and damaged by certain statements made by the de-
fendant David Brudnoy during the broadcast of a program
on the radio station owned and operated by the defendant
WHDH Corporation (WHDH).  After a judge in the Super-
ior Court denied both parties' motions for summary judg-
ment, the defendants petitioned a single justice of the Ap-
peals Court for authorization to appeal the denial under

---

[1] Karen C. Pritsker and Karenkir, Inc.

[2] WHDH Corporation.

G. L. c. 231, § 118, first par. The single justice granted the defendants' application and the defendants entered the appeal in the Appeals Court. We transferred the case here on our own motion. We now reverse the order of the Superior Court judge and order that judgments enter for the defendants.

The essential facts are not in dispute. In 1976, the Pritskers operated "dodin-bouffant" (the lower case is consistent with the name used in the record), a gourmet French restaurant owned by Karenkir, Inc., a corporation which was, in turn, wholly owned by the Pritskers. Brudnoy is a well known critic and radio talk show host. In 1976, he was employed by WHDH as the host of "Nightline," a nightly program which followed the familiar listener "call-in" or "two-way" format. On his program on September 10, 1976, Brudnoy and two guests from the restaurant industry discussed restaurants in the Boston area. This was the only major topic of the program. Shortly after the final segment of the program began, Brudnoy and his guests resumed their discussion of the custom of tipping which they had begun during the previous hour. Brudnoy criticized the European practice of some restaurants of adding the gratuity to the bill which Brudnoy opined interfered with the diner's right to communicate his or her pleasure or displeasure with the service. Brudnoy mentioned two restaurants by name, one of which was dodin-bouffant. When a guest attempted to "rise to the defense" of dodin-bouffant, Brudnoy acknowledged that the "[f]ood is fine . . . superb . . . absolutely." When the guest then commented on how well the restaurant's service staff coordinated a meal, Brudnoy replied: "They have gotten better. They have gotten better and better. It's just as I've said in all fairness. I praise the book, . . . the restaurant in my book.[3] The manage . . . the people who own the place are unconscionably rude and vulgar people. And the attitude that they communicate is awful. But the food is fine. And it kills me to say this because I

---

[3] Brudnoy is the author of a book of restaurant reviews.

would like to be able to dump on their restaurant. I keep going there hoping it will decline and it doesn't. The food is fine, the people who run it are PIGS."[4] Brudnoy admits that his remarks were intended to refer to the Pritskers.

In three recent cases we have defined the contours of an action of defamation. *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303 (1982), cert. denied, 459 U.S. 1037 (1983). *Myers* v. *Boston Magazine Co.*, 380 Mass. 336 (1980). *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220 (1979), cert. denied, 446 U.S. 935 (1980). In these cases we acknowledged the common ground that, for purposes of the First Amendment to the United States Constitution, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 339-340 (1974). However, these cases also recognized the distinction, expressed in Restatement (Second) of Torts § 566 (1977), between "pure" opinions — those based on disclosed or assumed nondefamatory facts — and "mixed" opinions — those opinions "apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." *Id.* at comment b. A "pure" opinion by itself is not actionable "no matter how unjustified and unreasonable the opinion may be or how derogatory it is." *Id.* at comment c. But a "mixed" opinion is actionable "if the comment is reasonably understood as implying the assertion of the existence of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion." *Id.* Conceding that Brudnoy's comments were in the

[4] In his answer to the complaint, Brudnoy admitted that he had "never formally met the [Pritskers]." In his deposition, which was submitted to the judge in support of the motion for summary judgment, Brudnoy stated that he did not know the Pritskers by sight but that he knew their names and had been informed that the people who owned the restaurant also operated it.

form of opinion, the plaintiffs contend that they are nonetheless actionable because they implied the existence of undisclosed defamatory facts about the plaintiffs.

"It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct . . . ." Restatement (Second) of Torts § 566 comment c (1977). In making this determination we look to the entire context of the communication. See *Cole* v. *Westinghouse Broadcasting Co.*, 386 Mass. 303, 313 (1982). In all the circumstances, we think that the average listener could not reasonably conclude that Brudnoy's comments were based on undisclosed defamatory facts.

Brudnoy was a recognized restaurant critic and his guests were experienced in the restaurant field. Brudnoy's comments arose during the course of a two-hour discussion about restaurants. With such participants engaged in such a discussion, the listener could expect the topic to go beyond simply the quality of food served and include consideration of such things as service and atmosphere. Indeed, the listener could expect to hear critical evaluation of all aspects of dining at the various restaurants under discussion. Further, the listener might expect that any opinions offered by Brudnoy or his guests about a particular restaurant would be based upon the totality of the speaker's observations of and experiences with the restaurant. Finally, the listener could expect that Brudnoy and his guests would invoke some hyperbolic or rhetorical language both in their praise and in their criticism of the restaurants.[5]

---

[5] Such hyperbole and rhetoric were used in the discussion. Brudnoy used the word "superb" to describe the food at dodin-bouffant and one of his guests called it a "superb restaurant" and gave its service staff an "A + " for its coordination of meals. When discussing the two restaurants that added the gratuity to the bill, Brudnoy had said earlier, "It bothers me enormously. I praise their restaurants because the cuisine is right: the attitude stinks. And the reason the attitude stinks is that they tell you

Within this framework, we look to the three underlying facts which Brudnoy disclosed. The first is that he disliked dodin-bouffant's practice of adding the gratuity to the bill; the second is that he had reviewed the restaurant in his book; and the third is that he had visited the restaurant on a number of occasions looking for reasons to criticize it. With these facts revealed within the general context described above, we think that the average listener would assume that Brudnoy's comments were based only on his observations of conditions at the restaurant, such as its service, decor, and atmosphere, and would regard his comments simply as his opinion of conditions which he, as a professional restaurant critic, found unsatisfactory or distasteful and which he reasonably attributed to the owners of the restaurant.[6] As such, Brudnoy's comments would represent pure opinion, based on partly disclosed and partly assumed facts, and would not be actionable.

The case of *Myers* v. *Boston Magazine Co.*, 380 Mass. 336 (1980), is instructive here. In *Myers,* we held that a statement in a satirical magazine article that Myers, a television sports news announcer, was "enrolled in a course for remedial speaking," was not actionable as a defamatory statement of fact. *Id.* at 341. We viewed the statement rather as an expression of opinion and concluded that "Myers' performances [which] were often on view . . . furnished the assumed facts from which the critic fashioned his barb." *Id.* In this case, we think that the conditions of the

---

whether or not you — they tell you that you are to tip by putting it into your bill. I want to be able to tip. I want to tip more if the service is good, and I want to tip nothing if the service is lousy . . . ." In speaking specifically of dodin-bouffant, Brudnoy noted, "The first time I was there they didn't [add the tip]. And then they got this horrible idea. It's done in Europe. But the Europeans, of course, also have socialism. And we don't have to imitate them."

[6] Brudnoy's earlier, unchallenged comment that "the attitude stinks," his use of the pronoun "they" when referring to individual restaurants, and his use of colloquial words such as "stinks," "lousy," and "horrible" are indications that Brudnoy was attributing the unpleasant conditions he found at restaurants to the operators in less than flattering terms.

restaurant, which was open to the public, represent the "performances" of its owners and serve a similar purpose.[7]

The specific context of Brudnoy's comments further supports our view that his remarks were based on assumed facts and did not imply the existence of undisclosed defamatory facts. The topic of conversation immediately preceding the challenged comments was the custom of tipping. The name "dodin-bouffant" arose because it was one of two local restaurants that added the gratuity to the bill. Brudnoy stated, "I praise their restaurants because the cuisine is right: the attitude stinks. And the reason the attitude stinks is that . . . they tell you that you are to tip . . . ." The thrust of the rest of his comments was directed at his dislike of this practice. It was not until the guest mounted his defense of dodin-bouffant by praising its food and service staff that Brudnoy responded with the statements challenged here. Although this was surely not the kind of "public debate" we spoke of in *National Ass'n of Gov't Employees, Inc.* v. *Central Broadcasting Corp.*, 379 Mass. 220, 228 (1979), Brudnoy's comments were made during a discursive, critical conversation and only in response to comments of his guests which had caused the focus of the conversation to shift from the practice of adding the gratuity to the bill

---

[7] The plaintiffs attempt to distinguish *Myers* v. *Boston Magazine Co.*, 380 Mass. 336 (1980), on the grounds that *Myers* concerned the plaintiff's characteristic, readily observable manner of speech whereas Brudnoy's comments imply specific vulgar or rude acts on the part of the Pritskers which a visitor to the restaurant could not be sure of witnessing. Thus, someone who visited dodin-bouffant without incident "would not know whether he had seen the facts upon which Brudnoy based his opinion." The problem with this argument is, as we have held, that in the present context the average listener would be unreasonable to assume that Brudnoy implied the existence of undisclosed, defamatory facts. The plaintiffs also attempt to distinguish *Myers* on the ground that Myers' performances were available for viewing to a wide television audience whereas the conditions of dodin-bouffant could be observed only by that small percentage of Brudnoy's listeners who lived near and could afford dodin-bouffant. The distinction fails to persuade us. We think it most likely that the majority of Brudnoy's listeners had dined in restaurants and were familiar with the kinds of conditions upon which Brudnoy presumably based his opinion.

to the quality of the service staff's performance at dodin-bouffant.  In this context, we think that the average listener would regard Brudnoy's comments concerning the restaurant's  owners as simply a short-hand expression to describe the sum of his opinion of all the conditions he found to exist at dodin-bouffant.

As to the Pritskers' contention that Brudnoy's comments imply the existence of undisclosed, defamatory facts, what we said in *Cole* v. *Westinghouse Broadcasting Co.,* 386 Mass. 303 (1982), is apt. "In the present case, it is not clear that any undisclosed facts are implied, or if any are implied, it is unclear what they are.  Finally, it is entirely unclear (even assuming that facts are implied) that they are defamatory facts." *Id.* at 313.  This holds true whether we would assume that any implied facts related only to the conditions of the restaurant, attributed to the Pritskers, or were direct personal references to the Pritskers.  What may be "unconscionably rude and vulgar" and suggestive of "pigs,"[8] to one person may be only mildly offensive to a second, merely not to the taste of a third, or even pleasing to a fourth. "[I]n order for an opinion to be actionable, the undisclosed facts must be defamatory." *Id.* at 313.  The average listener could not, in context, reasonably conclude that the facts, if any, implied by Brudnoy's comments must have been de-

---

[8] We reject the Pritskers' assertion that Brudnoy's use of the term "pigs" implied that "the Pritskers and their restaurant were unhygienic and unsanitary and were infested with cockroaches or other vermin." Brudnoy had characterized the food served at dodin-bouffant as superb.  It would be unreasonable for a listener to assume that a restaurant critic would employ such an encomium if he had knowledge that the food was prepared in unsanitary conditions without, at least, qualifying his praise. In context, it is evident that Brudnoy was instead contrasting the superior quality of food served with the "attitude" of the owners expressed in the restaurant's conditions.  We note that, in their depositions, the Pritskers indicate that they did not understand the word "pigs" as a reference to poor hygiene.  Mr. Pritsker stated that he understood the word to mean that he was [n]ot dirty, [but] rude and vulgar."  Mrs. Pritsker stated that she did not believe Brudnoy meant that she ran a dirty restaurant but instead she understood "pigs" as a word "used to describe someone who[ ] the writer believes is offensive, awful."

famatory. Thus, although Brudnoy's comments may have given the false impression that he knew the Pritskers and had observed them at the restaurant, his opinion is still not actionable because it does not reasonably imply defamatory facts.[9]

For the above reasons, we conclude that Brudnoy and WHDH were entitled to summary judgment and we therefore reverse the order of the Superior Court denying summary judgment and order that judgment be entered for the defendants.

*So ordered.*

---

[9] Although Brudnoy did not know the Pritskers personally, he knew of them and had indirectly had some correspondence with them. After Brudnoy's unfavorable review of their restaurant appeared in a locally published magazine in February, 1975, the Pritskers wrote a letter to the editor of the magazine, "[f]or [the] readers who have been offered only Mr. Brudnoy's outrageous non-truths about our restaurant," in which they cited a number of favorable reviews by other critics. The letter was not without negative comments directed personally at Brudnoy. Brudnoy responded to the letter in the same issue and concluded by saying: "[T]he Pritskers do protest too much, methinks. A course of action more promising than shrieking at the bearer of sad tidings would be some corrective surgery on the unpleasant warts, boils, and wens affecting Dodin-Bouffant. Bon chance, mes chers."

In December, 1975, roughly nine months before the broadcast, Brudnoy published a second review of dodin-bouffant in the same magazine. He mentioned "the howls of D-B's outraged owners and their aggrieved friends" after his previous review and noted that the restaurant "cavalierly adds a fifteen percent service charge (an ill-advised custom . . .)." However, Brudnoy stated that "[e]verything that had annoyed me before had vanished," and the review was otherwise quite favorable. There was no personal reference to the Pritskers other than that quoted above. If Brudnoy had developed a personal animosity towards the Pritskers as a result of these exchanges, this would not make his comments on the radio broadcast actionable, even if he had intended them as personal attacks. "[A]lthough the person making the communication intends it to convey a defamatory meaning, there is no defamation if the recipient does not so understand it." Restatement (Second) of Torts § 563 comment b (1977). Here, we have concluded that the average listener could not have reasonably understood Brudnoy's comments as being directed towards the Pritskers personally.