**Joseph RICCI, Plaintiff,**

v.

**VENTURE MAGAZINE, INC., Defendant.**

**Civ. A. No. 81–2182–K.**

United States District Court, D. Massachusetts.

Nov. 22, 1983.

Gregory V. Sullivan, Ralph Warren Sullivan, Malloy & Sullivan, Hingham, Mass., L. Michael Hankes, Malloy & Sullivan, Manchester, N.H., for plaintiff.

John M. Harrington, Jr., Cheryl A. LaFleur, Ropes & Gray, Boston, Mass., for defendant.

## OPINION

KEETON, District Judge:

This defamation case involves the common law privilege to report judicial proceedings and federal constitutional protection for media reports and for expressions of opinion. By reason of their combined effect, I conclude that summary judgment must be entered for the defendant.

No choice of law issue is argued by the parties, and for present purposes I look primarily to Massachusetts cases and the *Restatement (Second) of Torts* for guidance on the state law issues.

### I.

The alleged defamatory communication of which plaintiff complains is a portion of an article in the December 1979 issue of *Venture*, a magazine published by defendant and aimed primarily for distribution to entrepreneurs. Under the title "How the Mob Squeezes Entrepreneurs," the article developed a graphic description of its theme that "hundreds of people fall victim each year to organized crime's infiltration of legitimate businesses." On the sixth page appears an illustrative drawing above the inscription,

James Black was physically manhandled at the toy warehouse when he tried to collect money that was owed to his California firm, Litronix.

Beginning near the end of the fifth page and carrying over to the seventh page the following passage appears:

This July, a Federal Court jury in Boston returned the first guilty verdicts in a trial that involved a group of 20 men, several of whom were reputed high-ranking organized crime figures, including the "right-hand man" of Gennaro J. Angiulo, reputedly Boston's reigning don. For several years, the men operated what appears to be the largest bust-out operation in recent memory.

According to court records and unrefuted trial testimony, the men had set up at least 15 different corporations since 1972 for the sole purpose of receiving large orders of goods on credit. In each case the businesses were eventually either bankrupted or abandoned, leaving the unsuspecting creditors with unpaid bills.

Originally, many of the men entered into the illegal schemes as independent operators, according to Stephen Jigger, assistant U.S. attorney. But word quickly spread and before long the independents were muscled out of the scam or forced to pay protection by the strong arm of the Boston mob.

According to federal sources, at its peak the scheme was so successful that credit ratings for certain areas in New England, principally in the Boston area, were severely compromised, making it difficult for even legitimate businesses to buy on credit. While the scam stores, which specialized in the sale of appliances, electronic equipment, toys, and other easily salable items, took a number of legitimate companies for large amounts of cash, none was as severely hit as Litronix, a California-based electronics firm begun in 1970 by seven entrepreneurs.

According to Federal Court testimony given last April by James Black, a former purchasing manager and one of the founders of the firm, Litronix was forced to write off more than $300,000 in equipment ordered and shipped to stores operated by the racket. Black told the court he went to collect the debts because Litronix was experiencing serious cash flow problems and needed the money to pay its own venders.

Black travelled to Abington Discount in Brockton, Mass., in early fall 1974. Abington had ordered more than $80,000 in merchandise from the California firm over the past two years. When told the person he needed to talk to was unavailable, Black testified that he persisted. He said the clerk then went into the rear room.

"This time three gentlemen came out of the back of the warehouse," Black continued under oath. "One of the men came toward me and made a comment, something in essence, you know, I wasn't to be there. I wasn't going to get my money. I was physically manhandled out of the door. Somebody else opened the door. I was told to leave the premises and not to return."

In court, Black pointed out two of the men who had manhandled him. They were Richard DeVincent, 64, of Woburn, Mass., a convicted loan-shark and reputed organized crime figure, and Joseph Ricci, 40, of Duxbury. At presstime, DeVincent was awaiting trial for bankruptcy fraud and receiving stolen property. Ricci's case has been dismissed after an emotional outburst in which he threatened a witness in the courtroom.

Of the 20 men indicted, four are awaiting trial (including DeVincent), Ricci's case has been dismissed, one has died, five have been acquitted, five have pleaded guilty, and four—including Charles Tashjian, 42, of Norwood, Mass., who Federal law enforcement authorities say is the right-hand man of Angiulo—have been found guilty of bankruptcy fraud. Tashjian received five years.

The article is completed in an additional half page. The only references to the

plaintiff are those appearing in the last two paragraphs quoted above.

Plaintiff complains that in the article

■ [it was] stated as a fact that "Ricci's case has been dismissed after an emotional outburst in which he threatened a witness in the courtroom" ... [Memorandum in Opposition to Defendant's Motion for Summary Judgment, 2; ]

■ an illustration depict[s] two men manhandling said businessman with one of said two men bearing a strong and recognizable resemblance to the plaintiff [Complaint, ¶ 5; and]

■ the plaintiff was identified as being an affiliate of members of an organized crime syndicate and as being one of two men who physically manhandled a businessman reputedly involved with said syndicate [Complaint, ¶ 4].

An incident occurring during the criminal trial to which the *Venture* article referred was described in the following way by the appellate court, *United States v. Tashjian*, 660 F.2d 829, 837 (1st Cir.1981):

Following the morning recess on the thirteenth day of trial, one of the defense attorneys informed the court that defendant Martin had observed defendant Ricci threaten Ronald Davies, a Government witness who had been testifying that morning. According to Martin, as the jury left for the recess Ricci gestured with his hand and silently mouthed words to the effect that Davies would receive five bullets in his head. After the jury had returned and while the court consulted with counsel at the sidebar about the incident, defendant DeChane burst out, "All these defendants are in the Mafia, and Ron Davies told everybody." He then shouted at Davies, "You're a liar. I ain't no hit man for the Mafia and these guys." The court immediately requested the jury to leave the courtroom. Then, as the court and counsel debated the significance of DeChane's outburst, another disruption occurred and DeChane screamed, "The FBI is go-

ing to kill me. The FBI is going to kill me."

After excusing the defendants for the day and directing that DeChane receive medical attention, the trial court recalled the jury and carefully instructed them to disregard DeChane's outbursts, emphasizing his extreme anxiety and irrationality. The court then sought to discover what effect Ricci's gestures may have had. He asked the jurors whether they had seen anyone gesture towards the witness stand. None of the jurors responded affirmatively, confirming the court's belief that Ricci was not in the jurors' line of vision at the time of the reported incident. On the next day of trial the court granted the motions for severance brought by Ricci and DeChane and denied Tashjian's and Campbell's motions for mistrial. The court then explained to the jury why Ricci and DeChane were no longer present, again cautioned them to disregard DeChane's irrational conduct, and inquired whether any of them felt they no longer could impartially decide the case. All indicated they could proceed fairly.

The transcript of the trial discloses also that Ricci's counsel told the trial judge, at a conference outside the hearing of the jury, that Ricci was just running his fingers through his hair and did not threaten the witness. Tr. 13–142. Subsequently, the trial judge sustained Ricci's motion for dismissal of the indictment against him on the ground that it did not properly allege against him an offense under the RICO statute, 18 U.S.C. § 1961 *et seq.* CR No. 79–47–08, District of Massachusetts, Judgment of Dismissal by Garrity, J., July 26, 1979.

## II.

In resolving this motion for summary judgment, I will consider each of the three statements which plaintiff alleges produced a defamatory sting. The first of these is the report that "Ricci's case has been dismissed after an emotional outburst in which he threatened a witness in the courtroom."

## A.

Massachusetts common law has long recognized that a report of judicial proceedings is privileged if fair and accurate. *See, e.g., Thompson v. Globe Newspaper Co.,* 279 Mass. 176, 185–88, 181 N.E. 249, 252–53 (1932). *See also Lewis v. Vallis,* 356 Mass. 662, 666, 255 N.E.2d 337, 340 (1970). *Compare Restatement (Second) of Torts,* § 611 (1977):

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

■ The cases applying this privilege establish several principles. First, the requirement of fairness and accuracy extends only to matter relevant to a claimed defamatory sting—that is, to matter bearing upon whether the communication is reasonably susceptible of interpretation in a derogatory sense. *See, e.g., Williams v. WCAU–TV,* 555 F.Supp. 198, 202 (E.D.Pa. 1983). *Cf.* W. Prosser, *Torts* § 116 at nn. 18, 19 (4th ed. 1971) (to establish defense of truth it is not necessary to prove literal truth; sufficient to show substantial truth supporting "gist" or "sting" of alleged defamation).

■ Second, the assertion that the report is privileged as being "fair and accurate" differs sharply from the assertion that it is privileged because it is true. For example, a journalist may report testimony offered in court that injures another without determining whether the testimony is in fact true. The decisive issue is whether the journalist's report of testimony was fair and accurate. *See Lambert v. Providence Journal,* 508 F.2d 656 (1st Cir.), *cert. denied* 423 U.S. 828, 96 S.Ct. 45, 46 L.Ed.2d 45 (1975) ("the term ['murder'] ... merely echoes the report of the charges against [plaintiff] without implying their truthfulness"). *Cf. Fite v. Retail Credit Co.,* 386 F.Supp. 1045, 1046 (D.Mont.1975), *aff'd* 537 F.2d 384 (9th Cir.1976) ("records of indictments, arrests, and arraignments are constantly reported without liability, and this even though any particular case may be later dismissed or a judgment of acquittal entered").

■ Third, a "fair and accurate" report need be neither exhaustive in detail nor perfectly precise in language. The essence of the "fair and accurate" requirement is that the report be "accurate and complete *or a fair abridgement of the occurrence reported.*" *Restatement (Second) of Torts,* § 611 (1977) (emphasis added). Media reports serve the public purpose of informing readers who wish to know what occurs in courts, but cannot make the personal sacrifices required to attend in person. Daily reports of events occurring during long trials are permissible, and even the report of a single day's proceedings commonly focuses on one or more events of special interest. Judicial proceedings often consist of long periods of unexciting evidence and colloquy, punctuated by occasional exchanges among participants in which depths of human emotion are exposed. Media reports may permissibly focus on the more dramatic occurrences, to the exclusion of the less interesting. Similarly, a journalist's report need not describe legal proceedings in technically precise language. "Accuracy in this respect means substantially accurate and not distorted and [the report] need not be correct in every particular." *Lewis v. Vallis,* 356 Mass. at 666, 255 N.E.2d at 340. For instance, a report that a plaintiff had been "committed" to a state hospital was not actionable, even though there had not been an official commitment proceeding. *Joyce v. Globe Newspaper,* 355 Mass. 492, 245 N.E.2d 822 (1969). *See also Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161, 166 (1975); *Thompson v. Boston Publishing Co.,* 285 Mass. 344, 348, 189 N.E. 210, 212–13 (1934); *Lambert v. Providence Journal Co.,* 508 F.2d at 659. These cases indicate that courts hearing defamation claims are to apply a common sense standard of expected lay interpretation of media reports of trials, rather than inquiring whether a report was strictly correct in defining legal charges and describing legal rulings.

Finally, the common law privilege shielding reports of judicial proceedings has been expanded in the last two decades by constitutional protections for libel defendants. *Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976). *See* W. Prosser, *Torts* § 118 at n. 64a (4th ed. 1971). Now, to be actionable, not only must the defamatory "sting" arise from an unfair and inaccurate report, but also the lack of fairness and accuracy must be due to some fault of the defendant. This principle is explicitly stated in the *Restatement (Second) of Torts*, § 611, comment *b* (1977):

> The Constitution is now held to require the plaintiff in an action for defamation to show that the defendant, in publishing a false and defamatory communication concerning him, was at fault regarding the injurious character of the statement.... The privilege stated in this Section permits a person to publish a report of an official action or proceeding or of a public meeting that deals with a matter of public concern, even though the report contains what he knows to be a false and defamatory statement. The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement.

With these principles in mind, I consider first the statement that Ricci threatened a witness in court. The report of the threat was based on the trial transcript, which reveals that the judge received reports from a federal marshal and a defense attorney that Ricci had gestured at or threatened a witness. Tr. 13–100. Later, the judge was told that the witness had seen the gesture and reported it to the marshal. Tr. 13–141–42. As a result of this incident, several defendants moved for mistrial and Ricci moved for severance. A lengthy colloquy followed, in which several versions of the incidents were offered. Ricci's counsel himself said Ricci made a gesture of pushing his hair back and "was scowling" at the witness. Tr. 13–142. He conceded, however, that the meaning of the gesture was "a question of interpretation."

The trial was recessed without a resolution and on the next day the judge severed Ricci's case.

Clearly the defendant's report that Ricci threatened a witness had adequate support in the transcript. The report, however, does not disclose that the allegation about Ricci was contradicted by Ricci's attorney. Nevertheless, a report will not be actionable simply because it condenses a long and complex discussion or incident, unless it does so unfairly. The privilege, as stated in the *Restatement (Second) of Torts*, § 611, extends to a "fair abridgement of the occurrence reported."

In this instance, applying a common sense standard of expected lay interpretation of the report, I conclude that it could not be found that the abridgement was an unfair one. Although the public may not fully understand the presumption of innocence in criminal proceedings, no doubt they understand that there is a difference between a charge and a conviction. They understand, as well, that participants in a trial often make sharply conflicting contentions, and that witnesses often give conflicting testimony. Media reports are not required to remind readers of such well understood matters as these. The critical question is whether a report of a trial occurrence can reasonably be interpreted as describing the occurrence in a way that conveys a materially greater defamatory sting than would be conveyed by a technically correct and less abridged report. If not, the report has not offended the fairness requirement. A full report of all the details of this incident, including the two eyewitness reports, the claims that the gesture was a threat, and the judge's decision to sever, as well as Ricci's attorney's version, would be no less susceptible of being read as conveying a sting derogatory to plaintiff than was the abridged report actually made. Therefore, I conclude that in relation to the charge of threatening a witness, the *Venture* article was within the scope of the privilege to publish a fair and accurate report of an occurrence in a criminal trial.

### B.

The rationale underlying constitutional protection for expressions of opinion reinforces the conclusion that Ricci cannot succeed in a claim based on the report that he "threatened a witness." I come to this conclusion even though the statement that he "threatened a witness" may not be an expression of "opinion" as that term is ordinarily used in this context.

The seminal description of the constitutional protection for expressions of opinion in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 325, 340, 94 S.Ct. 2997, 3000, 3007, 41 L.Ed.2d 789 (1974) states:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas....

This opinion privilege was invoked recently in Massachusetts to support judgment for a radio commentator and the station that broadcast his critical comment referring to the restaurant operated by the plaintiff. *Pritsker v. Brudnoy*, 389 Mass. 776, 778, 452 N.E.2d 227, 228 (1983). *See also Cole v. Westinghouse Broadcasting Co.*, 386 Mass. 303, 435 N.E.2d 1021 (1982); *Myers v. Boston Magazine Co.*, 380 Mass. 336, 403 N.E.2d 376 (1980). This protection applies to expressions of opinion wherever they appear, including those included in a report of judicial proceedings. *Cf. Orr v. Argus-Press*, 586 F.2d 1108 (6th Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (newspaper's non-technical characterization of charges in an indictment are protected as opinion).

Implicit in the rules of constitutional protection for expressions of opinion is a distinction between fact and opinion. For several reasons, however, the essence of this distinction is less than clear. Reference to other legal contexts where this distinction arises is not decisive. For instance, if Ricci were charged with threatening a witness, a question of fact would be presented for the jury to resolve. Yet, if a witness were testifying about his observations of Ricci's conduct, he might not be allowed to characterize the gesture, which he saw, as a threat because to do so would be to express an opinion. Fed.R.Evid. 701. A trial judge might so rule, as a matter of discretion, even though lay witnesses are sometimes allowed to speak in somewhat conclusional ways as shorthand renditions of factual observations.

The fact-opinion distinction also lacks clarity in that, in rulings on objections to the testimony of lay witnesses describing events they observed, and in other contexts, "fact" is commonly used in a sense that incorporates interpretations of sensory perceptions. The line between such interpretations and expressions of opinion is unclear. The reports of observers of judicial proceedings—including those who saw Ricci's gesture to the witness—are necessarily interpretive to some extent. It would defy common sense and disregard human experience to expect that one who is reporting a courtroom event either to the trial judge or to an outside audience would or could do so in the form of a completely accurate recital of no less and no more than the sensory perceptions of observers who were present. Thus, the report that Ricci made a threat was in reality a report of observers' inferences drawn from facts they observed. Had the reporter been in court to witness the incident himself, he would have been able to draw the same "inference."

Precedents are in conflict as to whether such an inference about a person's conduct can be classified as "opinion" in the sense relevant to constitutional protection for expressions of opinion. For instance, *Cianci v. New York Times Publishing*, 639 F.2d 54, 62 (2d Cir.1980), supports a ruling that any statement the truth or falsity of which would be submitted to a fact finder is a statement of fact, not opinion. Such a rule would lead to the conclusion that the statement about the threat could not be a constitutionally protected "opinion." *See Avins v. White*, 627 F.2d 637 (3d Cir.), *cert. denied*, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (statement that actor's conduct was "a lot worse than bad judgment" taken as implying an inference of

fraud; treated as not within constitutional protection for expressions of opinion). *Compare Burns v. McGraw-Hill, Inc.,* 659 P.2d 1351 (Colo.1983) (divided court held that television reporter's statement that wife of injured police officer had "deserted him since the accident" was actionable because implying the existence of an undisclosed factual predicate). *But see Kotlikoff v. Community News,* 89 N.J. 62, 444 A.2d 1086 (1982) (letter to editor of local newspaper criticizing official conduct of mayor, suggesting that mayor and taxpayer might be "engaged in huge coverup," was published under heading "A Conspiracy?"; held, summary judgment for defendant was proper; significant facts upon which writer based opinion having been disclosed in the letter, a defamation action premised on expressed opinion fails "no matter how unjustified, unreasonable or derogatory the opinion might be").

I need not choose among these conflicting precedents to decide the present case. *Cianci* and *Avins* differ from this case in that in each of those cases the derogatory inference was drawn in the challenged report itself. In this case, on the other hand, the report repeats an inference drawn and acted on by participants in the judicial proceedings. In *Cianci,* there was no support for the conclusion that the reported criminal activity had occurred, other than the allegations of a woman made to the reporter, which allegations the reporter concluded were true. In this case, it is indisputable that Ricci made some sort of gesture in the courtroom. The inference that this gesture was a "threat" was drawn by at least one witness whose observations were reported to the judge. The *Venture* article does no more than recite that inference characterizing conduct which occurred in fact.

Nor is the statement that Ricci "threatened a witness" actionable on the theory that it is a "mixed" or "hybrid" statement of fact and opinion. A statement in opinion form may be actionable if it implies unstated defamatory facts that are false. For present purposes I assume that this rule extends to media reports of judicial proceedings, at least when supplemented by a

fault requirement. See *Restatement (Second) of Torts,* § 611, comment *b* (1977).

Problems of applying to particular cases the rule regarding mixed or hybrid statements have produced sharp conflicts. *See, e.g.,* the opinions in *Ollman v. Evans,* 713 F.2d 838 (D.C.Cir.1983), vacated, Oct. 6, 1983; rehearing *en banc* scheduled for March 6, 1984. In whatever way these conflicts may be resolved, however, it remains clear that the mixed statement is actionable only if it expresses derogatory facts or implies the existence of unstated derogatory facts upon which the opinion is founded. I conclude that this prerequisite to liability cannot be met in this case.

Massachusetts courts have been reluctant to interpret potentially "mixed" statements as implying undisclosed defamatory facts. For instance, in *Pritsker v. Brudnoy,* 389 Mass. at 780, 452 N.E.2d at 229, statements characterizing plaintiffs, two restaurateurs, as "unconscionably rude and vulgar" and as "pigs" were held to be privileged opinions since "the average listener would assume that [defendant's] comments were based only on his observations of conditions at the restaurant ... and would regard his comments simply as his opinion ...." *See also Myers v. Boston Magazine Co.,* 380 Mass. 336, 403 N.E.2d 376 (1980) (statement that a professional newscaster was "enrolled in a course for remedial speaking" was a privileged expression of opinion based on observation of plaintiff's performance).

■ In this case, the defendant reported a conclusion that was offered in court by persons who had witnessed plaintiff's actions. The report, although it does not explicitly state that it is based on courtroom observations, is clearly a report of a trial. The article cannot be reasonably interpreted as implying that the statements about Ricci are based on facts occurring outside the trial. Nor does it imply that there was an adjudication that Ricci had threatened a witness. Thus, the defendant's characterization of Ricci's conduct as a "threat" is privileged as a report of an inference expressed by a participant in the

judicial proceedings. If treated as an opinion, it is protected under the opinion rule. If treated instead as a statement of fact, it is privileged as a fair and accurate report of a statement of fact made during the judicial proceedings.

### C.

█ As a final independent ground for summary judgment on this point, I conclude that plaintiff has not offered evidence which would support a finding of fault in relation to defendant's report of the threat. Without such a showing, this claim cannot proceed.

Even if the report of the "threat" were not held to be privileged as a "fair and accurate" report, because of incompleteness, and if it were not held to be protected opinion, plaintiff would still have to overcome the constitutional requirement of fault by showing, at the least, that defendant acted with negligent disregard for the truth in making the statement. Defendant relied on the trial transcript in making the report. As observed above, that transcript contains sufficient basis for a reasonable person to conclude that a threat actually occurred. The only conflicting evidence in the transcript was the disavowal by Ricci's attorney, who admitted that the gesture was open to interpretation. Tr. 13–142. The transcript also contained evidence of unusual behavior by Ricci at other points in the trial, Tr. 13–103, 13–107, 13–200–201, and admissions by Ricci's counsel and by Ricci himself that he was emotionally distraught and unable to control his behavior, Tr. 13–200–204, 13–212–213. Also, the reporter reading this transcript could reasonably take the judge's decision to grant severance as support for a conclusion that the threat had occurred.

It may be argued that Supreme Court decisions recognizing the constitutional requirement of fault with respect to accuracy of a derogatory statement of fact necessarily so modify earlier precedents regarding reports of public proceedings as to compel summary judgment for media defendants as to any challenge for incompleteness of a report in failing to disclose contentions or evidence contradictory to that correctly reported. I do not conclude that such an invariable rule is implicit in the constitutional requirement of fault. Nevertheless, it is clear that merely showing contradictory evidence upon which reasonable persons might come to different findings is insufficient to show that defendant displayed an unreasonable disregard for the accuracy or fairness of the report. At least in the circumstances of the present case, as recited in this opinion, plaintiff has failed to show evidence that would support a finding of negligent disregard and thus establish a dispute of fact material to the constitutional defenses to the claim based on the report that Ricci threatened a witness in the courtroom.

### III.

█ Having considered separately the statement that Ricci "threatened a witness in the courtroom," I turn now to other aspects of the broader claim of which this was one part—the claim that the article defamed plaintiff by stating as a fact that "Ricci's claim has been dismissed after an emotional outburst in which he threatened a witness in the courtroom."

Plaintiff argues that, contrary to the implication of the article, what occurred in the courtroom was irrelevant to dismissal, which was grounded on failure of the indictment to state a case against him under the RICO statute. He argues also that the references to an "emotional outburst" are inaccurate because Ricci did not in fact engage in an emotional outburst.

There is no doubt that an event interpreted by the trial judge as an emotional outburst did occur. The report to the trial judge that Ricci made a threat, discussed in part II above, was a part of the sequence of events that included the outburst. Even if the characterization "emotional outburst" is interpreted as applying to Ricci rather than to others, there is considerable support in the trial transcript for this characterization, including statements by Ricci's own counsel and by Ricci himself. Tr. 13–201–204; 12–210–213. Moreover, this characterization adds nothing to the sting

of the charge that he threatened a witness. The reporter who is describing courtroom incidents must be allowed a reasonable freedom in choice of language. *See Orr v. Argus-Press*, 586 F.2d 1108 ("swindle" and "fraud" used instead of technical terms for securities law violations); *Lambert*, 508 F.2d 656 ("murder" used instead of "homicide"). It cannot be found that the term "emotional outburst" was unfairly applied to the incident the reporter was describing, or even to Ricci's participation in it.

It is literally true that Ricci's case was "dismissed after" the outburst, though of course not true that it was dismissed either because of the outburst or because of any threat against a witness. Inaccuracy in these latter respects, however, is not material to the alleged defamatory sting. The reference to dismissal of the case, if not reducing the defamatory sting of the charge of threatening a witness, certainly cannot be interpreted reasonably as enhancing the sting.

For these reasons, I conclude that the references to an emotional outburst and to dismissal do not impair the privilege that, in part II, I have found applicable here.

## IV.

I turn now to the other statements which plaintiff claims carried a sting.

### A.

■ Plaintiff argues that the *Venture* article implies that he is an affiliate of organized crime and a member of the "mob." Media reports of trials, however, do not exceed the limits of permissible reporting merely because one who reads an account of evidence offered might infer derogatory innuendos not adjudicated to be true.

■ It is true, of course, that one may not avoid liability for a defamatory sting by merely adding a truthful preface that someone else has so stated. *See Restatement (Second) of Torts*, § 578, comment *b* (1977). This rule is essential to precluding a speaker's evasion of the rules protecting interests in reputation by stimulating another to make a statement, which the speaker then accurately repeats as the statement of the other. But this rule is inapplicable to statements made in trials, because the public has an interest in the reporting of judicial proceedings, including reports of charges and contentions and not merely adjudicated facts.

■ The *Venture* article reports testimony of a witness that plaintiff was one of two persons who "manhandled" him, and reports further that the other person was "a convicted loan shark and reputed organized crime figure." The transcript of the court proceedings confirms that each of these statements of alleged fact was made in the court proceedings. Nor has plaintiff called attention to any evidence received in the judicial proceeding that would have tended to contradict the adverse inference of which plaintiff complains. Thus plaintiff fails to show the article to be unfair because incomplete.

### B.

■ Plaintiff argues also that the pictorial illustration, the caption and the remainder of the article, taken together, go beyond the limits of a permissible report because they could lead a reader to infer that plaintiff, in fact, manhandled James Black, whereas he has never been convicted of the described offense. The *Venture* article is a permissible report of evidence, in relation to this matter, that was offered at the public trial. The issue here is not whether plaintiff committed the offense but instead whether the *Venture* article was privileged as a report of evidence that was presented in the trial it was describing. Nor does the form of the report—a pictorial illustration rather than a recitation of the verbal evidence as it was received at the criminal trial—defeat the privilege. The pictorial illustration, taken together with the caption under it and in the context of other statements in the article in which it appeared, is not susceptible of interpretation as stating or implying facts about plaintiff beyond those stated in evidence in the criminal trial to which the article referred. *Cf. Williams v. WCAU–TV*, 555 F.Supp. 198 (E.D.Pa.

1982) (picture of libel plaintiff under arrest accompanying broadcast about bank robbery does not create implication that plaintiff committed the robbery). In deciding questions such as this, I am mindful of the First Circuit's instructions that the court is to "read[ ] the article[ ] in [its] entirety." *Lambert v. Providence Journal*, 508 F.2d at 658. The picture and caption cannot be separated from the text of the article, which makes clear that the claim of "manhandling" was a report of trial testimony. In fact, the caption alone could not be defamatory, because it does not identify Ricci, whose name is mentioned only in the text. The "characterization" found in the illustration is accompanied by a fair and accurate report of the relevant trial testimony, which fully supports the characterization.

### V.

In summary, viewed most favorably to the plaintiff's claim that it was defamatory, the *Venture* article may be read, as indicated by the title, as focusing on "How the Mob Squeezes Entrepreneurs," and as reporting that evidence offered at a public trial identified plaintiff as a person affiliated with others who were reputedly members of an organized crime syndicate, and showed that one of the group that included plaintiff physically manhandled a businessman who became a victim by involvement with the syndicate. The article further reports that plaintiff threatened a witness, an allegation made during trial and acted upon by the trial judge. The article cannot fairly be read, however, as asserting any historical facts involving the plaintiff other than those disclosed in the criminal trial referred to in the article. I conclude that the privilege of the defendant, as publisher of a magazine article, to include within it a report of judicial proceedings is established. All factual statements in the article about plaintiff were within the scope of a permissible report of the evidence received and other events occurring during the criminal trial.

No material dispute of fact exists. Defendant's motion for summary judgment must be allowed.