Dupuis, Renee, J.
This is an action brought by plaintiffs, Clay Corporation d/b/a Clay Nissan Nor-wood, Norwood Subaru, Inc. d/b/a Clay Subaru, Clay Nissan of Newton, Inc. d/b/a Clay Nissan of Newton, Clay Chevrolet, Inc. d/b/a Clay Chevrolet and Clay Hyundai, and Scott Clay, collectively (“Clay”), against Adam Brook Colter and Jonathan Colter (“Colters”) seeking damages for defamation and intentional interference with advantageous relations. The Plaintiffs seek injunctive relief and attachments in the amount of 1.5 million dollars. The matter is before the Court on plaintiffs motion for preliminary injunction pursuant to Mass.R.Civ.P. 65(b) and plaintiffs’ motion for attachment pursuant Mass.R.Civ.P. 4.1 and 4.2.*
BACKGROUND
This case arises out of a social media campaign conducted by the Colters against their sister Jill Colter’s[2] former employer, Clay Nissan, as a consequence of her termination in June of 2012 by Clay from her position as service writer. After their sister’s termination, Adam and Jonathan Colter engaged in a far reaching, extremely aggressive social media campaign against Clay harshly criticizing the Plaintiffs for terminating their sister “because she had cancer” and urging their readers to boycott all the Clay dealerships. The Plaintiff seeks to enjoin the speech and social media postings and other activities of the Colters and is also seeking to attach the Colters’ real estate holdings and bank accounts.
An evidentiary hearing was held over two days, August 13 and 14, 2012. Four witnesses testified and seven exhibits were introduced by the parties. Based upon the credible testimony of the witnesses, the exhibits introduced and the reasonable inferences that can be drawn from the evidence, the court makes the following findings. In the early spring of 2011, Clay Nissan’s service manager, Christine White (“White”), was in need of an additional service writer in her department.[3] Jill was recommended to White by a colleague. At the time he made the recommendation, *537 the colleague informed White that Jill had cancer and oftentimes needed to take time off for medical appointments, treatment and recovery. From White’s perspective, Jill’s illness was not an impediment to her employment in the service department; White’s own son also has serious health issues and she understood the need for employees to take time off for medical reasons. Clay had always been accommodating with her family’s medical issues and other Clay employees’ absences due to health, problems.
White interviewed Jill for the position. At the interview, Jill informed White that she had cancer. Again, this information was not an impediment to Jill’s securing employment with Clay. Jill started in May of 2011. Within a few months after Jill started, White had to speak to Jill about her interactions with employees and customers, as her conduct was not acceptable in the workplace environment. Approximately ten months after she started, Jill had a recurrence of her illness. Clay provided her with paid leave, although they were not required to do so. Jill returned to work on May 15, 2012. After Jill’s return to work several other incidents involving Jill’s behavior were brought to White’s attention. After consulting with Clay Nissan’s general manager, White terminated Jill from Clay Nissan based upon these issues.
At the time of Jill’s termination, there were two other employees in the service department who had cancer, both of whom had been fully supported by White and Clay during their illnesses. White was very conflicted about the conclusion that the situation warranted termination of Jill. She agonized over the decision, particularly in light of Jill’s illness and the fact that her own son had similar serious medical issues, which caused her to identify with what Jill was experiencing. However, she and the general manager ultimately decided that Jill’s conduct required termination. Scott Clay did not personally have any input into the hiring or firing of Jill.
Soon after learning of their sister’s termination, the Colters started a social media campaign against Clay. They launched a dedicated Facebook page titled “Boycott Clay Nissan” (“Facebook Boycott”). John created a separate website urging readers to “fight the company that fired the woman without cause who is fighting stage four melanoma.” (“Website Boycott.”) The Colters are the only administrators of the websites; consequently they control all the content. As of the date of the evidentiary hearing in this matter, August 14, 2012, the Colters had 30,000. followers. In the Facebook and Website Boycotts, the Colters make a variety of different claims, most of which Clay has demonstrated a reasonable likelihood of proving to be false and defamatory. In particular, the Colters claim through various posts that their sister was terminated because she had cancer, that Clay had terminated other cancer patients, and that the Clay dealerships had a pervasive policy of discrimination against cancer patients. More recently, the defendants have asserted that Clay violated federal law by terminating their sister. When other individuals attempted to post contradictory examples where plaintiff supported employees suffering from cancer or otherwise defending Clay, the Colters deleted the posts.
Noticeably absent from Adam Colter’s testimony was any information which supported the defamatory claims. Clearly, the siblings enjoy a very close relationship. Jonathan and Adam Colter were understandably devastated by the recurrence of their sister’s cancer. However, Jonathan was vague about the circumstances of his sister’s illness, and what information, if any, Clay had about her illness. He claims not to have known that Clay was aware of Jill’s illness when they hired her. Given the obvious closeness of these siblings, that assertion strains credulity. I find that in all likelihood the Colters knew that Clay was aware that Jill had cancer when they hired her.[4]
At no time did Adam Colter testify concerning any conversations he had with his sister or any other source for his accusations that Jill was fired because she had cancer. Rather, according to Adam, Jill reported to him that she was terminated because the company was going in a different direction. From the evidence before me it appears that the Colters jumped to the conclusion that Jill was fired because she had cancer based upon their own suspicions, while in the possession of information that calls that assertion into question.
Of great significance to the court, when pressed by counsel for Clay about his assertions that Clay had fired others because they had cancer, Adam Colter insisted that he had received emails from other former employees of Clay who had informed him that they had been fired by Clay because they had cancer. He insisted that he just needed a moment to look at his phone to retrieve the e-mails. When granted that opportunity, he did not produce any e-mails, claiming that they were on a different e-mail account that he could not access off his phone. Adam Colter was afforded one week to produce the e-mails for the court. No such e-mail has been produced. I infer from the absence of any documentation that no such e-mail was ever received by the Colters.
During the pendency of this matter, the Colters have been exposed to many additional facts which would cause a reasonable person to conclude that Jill’s termination was not based in any way upon her illness. The Colters have chosen to ignore those facts and have stepped up their relentless campaign against Clay.
The Colters’ campaign has produced their desired results. White, Scott Clay and other Clay employees have received very angry, threatening and disturbing e-mails from the Colters’ followers. At least one organized picketing protest has been conducted at the dealership. Many of the authors of the responsive *538 posts have pledged to boycott Clay and urge their friends and colleagues to do the same. Clay’s business has been severely and adversely impacted. In the month of July 2012 alone, the business suffered a loss of over $100,000 higher than normal. If the defendants continue in their relentless campaign against the plaintiffs their conduct may very well have its desired effect: the crippling or destruction of the plaintiffs’ business, thereby putting every employee of the plaintiffs and their families at the risk of losing their jobs.
DISCUSSION
A preliminary injunction is warranted when the moving party establishes: (1) a likelihood of success on the merits of the claim; (2) that irreparable harm will result in the absence of an injunction; and (3) that the harm to the moving party outweighs any harm the opposing party would suffer if the injunction entered. Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). To obtain attachments under Mass.R.Civ.P. 4.1 and 4.2 the plaintiff need only show a reasonable likelihood that he will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown to be available to satisfy the judgment.
I. Plaintiffs Likelihood of Success on the Merits Defamation Claim
Under Massachusetts law, a plaintiff alleging libel must ordinarily establish five elements: (1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss. Noonan v. Staples, 556 F.3d 20 (1st Cir. 2009); Stanton v. 2 Metro Corp., 438 F.3d 119, 124 (1st Cir. 2006) (citing White v. Blue Cross & Blue Shield of Mass., Inc., 809 N.E.2d 1034, 1036 (Mass. 2004)).
A statement is defamatory if it “may reasonably be read as discrediting [the plaintiff] in the minds of any considerable and respectable class of the community.” Disend v. Meadowbrook Sch., 604 N.E.2d 54, 55 (Mass.App.Ct. 1992) (citing Sharratt v. Housing Innovations, Inc., 310 N.E.2d 343, 346 (Mass. 1974). A statement is considered defamatory if it holds plaintiff up to hatred, ridicule or scorn and tends to discredit plaintiff in the minds of any considerable and respectable class in the community. King v. Globe Newspaper Company, 400 Mass. 705, 718 (1987); Ingalls v. Hastings & Sons Pub. Co., 304 Mass. 31 (1939). Where the defamatory communication consists of a statement in the form of an opinion, it is actionable only if the statement implies the allegation of undisclosed defamatory facts as the basis for the opinion. King v. Globe Newspaper Company, 400 Mass. 705 at 713 (1987); Pritsker v. Brudnoy, 389 Mass. 776, 778-79 (1983).
Truth is a complete defense to slander and is a defense to libel unless actual malice is proved by the plaintiff. McAvoy v. Shufrin, 401 Mass. 593, 597 (1988). The burden of proving the truth of statements is upon defendant, who must show that the statement is true in all material aspects. Maloof v. Post Pub. Co., 306 Mass. 279, 280 (1940). Substantial, not literal, truth is required. Connor v. Standard Pub. Co., 183 Mass. 474, 478 (1903).
Where the plaintiff is a public figure,[5] the defamatory statements must be made with “malice.” The plaintiff establishes actual malice by proving that the defendant knew the allegedly libelous statement was false when it was published, or that the defendant acted with “reckless disregard” for whether it was true or false — that is, the defendant “entertained serious doubts” as to its truth or falsity. McAvoy v. Shufrin, 401 Mass. 593 (1988). “Since it would perhaps be rare for a defendant ... to admit to having had serious, unresolved doubts, the jury may reach their conclusion as to the defendant’s subjective knowledge based on inferences from objective evidence.” Lyons v. New Mass Media Inc., 390 Mass. 51, 56-57 (1983). Thus the defendant cannot ensure a favorable verdict merely by testifying that he published under the subjective belief that the statements were true. St. Amant v. Thompson, 390 U.S. 727, 732 (1968); Lyons v. New Mass Media, Inc., supra at 51.
In applying these factors to the case at bar, I find that the plaintiffs have a substantial likelihood of success on the merits. As previously noted, White’s testimony surrounding the hiring and firing of Jill was very credible. Adam Colter’s testimony was not. That the statements are defamatory is clear. The Colters have claimed on their website many times that there were others fired from Clay for the same reasons, yet they have not produced a single shred of documentation to support that claim. They have deleted from the websites posts from other Clay employees who reported that Clay was extremely supportive of them in similar circumstances. Although it may very well be within their rights to delete such posts, those posts put the Colters on notice that there was a substantial likelihood that their assertions were false. Similarly, in all likelihood, the Colters were informed by their sister of her new job with Clay, and that Clay was aware of her illness, which also bears on the issue of malice. The plaintiffs have established a reasonable likelihood of success on each element of this claim.
Intentional Interference with Advantageous Relations
In order to prevail on a tortious interference with business advantage claim, a plaintiff must prove “(1) a business relationship or contemplated contract of economic benefit; (2) the defendant’s knowledge of such a relationship; (3) the defendant’s interference with it through improper motive or means; and the plaintiffs loss of advantage directly resulting from the defendant’s conduct.” Am. Private Line Serv., Inc. v. Eastern Microwave, Inc., 980 F.2d at 36 (citing United *539 Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815, 551 N.E.2d 20, 23 (1990)). I find that the plaintiffs have established a reasonable likelihood of success on every element of this claim as well. Indeed, it is apparent that it is the goal of the Colters’ media campaign to harm plaintiffs business.
II. Plaintiffs Risk of Irreparable Harm
Plaintiff argues that if an injunction does not issue restraining defendants’ speech and activities, plaintiff will continue to suffer substantial economic losses which will cripple plaintiffs’ businesses. Plaintiff also argues that defendants’ statements have already damaged its business reputation and will cause plaintiff irreparable harm unless enjoined. Plaintiff has supported these assertions with credible evidence through affidavits, testimony and exhibits.
III. Balancing Risk of Harm Against First Amendment Rights
Although it appears that the failure to issue an injunction may subject plaintiffs to a substantial risk of irreparable harm, this risk must be balanced against the defendants’ First Amendment right to free speech, protected from prior restraint. “It is apparent that the constitutional protections of free speech and public interest in the discussion of many issues greatly limit the area in which the power to give injunctive relief may or should be exercised in defamation cases.” Krebiozen Research Foundation v. Beacon Press, 334 Mass. 86, 93 (1956), cert. denied, 352 U.S. 848 (1956). “Our law thinks it is better to let the defamed plaintiff take his damages for what they are worth than to entrust a single judge (or even a juiy) with the power to put a sharp check on the spread of the possible truth.” Id. at 95. “[E]ven allegedly false and defamatory statements are protected from prior injunctive restraint by the First Amendment and art. 16 of the Massachusetts Declaration of Rights.” Nyer v. Munoz-Mendoza, 385 Mass. 184, 188 (1982), citing Krebiozen.
Although the plaintiff may well prevail on most of its claims, its likelihood of success must be evaluated against the harm to it if the injunction is denied and the risk of irreparable harm which granting the request would create for the defendants. The harm created by restraining speech is a far greater one than that which can be cured by a monetary award. Although plaintiff asserts irreparable injuiy to its business reputation and economic interests, on balance, at this juncture, defendants present the more compelling argument. Their First Amendment right to express their views should not be subject to prior restraint by this Court. Plaintiffs must resort to money damages for remedy of those harms which they can prove arising from the underlying claims.
However, as there appears to be a reasonable likelihood that plaintiffs will recover a substantial judgment, the plaintiffs’ request for an order of attachment and trustee process will be granted.
ORDER
For the foregoing reasons, it is hereby ORDERED that an attachment be issued against the assets of Adam Colter and/or Jonathan Colter in the amount of $1,500,000.00. $750,000 of this attachment is attributed to the plaintiffs’ claims of interference and the court will issue the necessaiy writs for trustee process subject to all applicable exemptions and limitations provided by law. The remaining $750,000 is attributed to plaintiffs’ claims of defamation and can only be used to attach assets as indicated by Rule 4.2 and 4.3. Further, within seven business days of the docketing of this decision, counsel for Adam and Jonathan Colter must provide plaintiffs with a verified list of any bank or savings institution with which they maintain accounts.

 Editor’s Note: For a later opinion in this matter see 30 Mass. L. Rptr. 429 (Salinger, Kenneth W., J.) (opinion dated December 11, 2012) (holding that the anti-SLAPP Suit Statute does not bar the action).

 Because this matter involves members of the same family, the court will refer to those family members by their first names for ease of identification.

 I credit White’s testimony in all respects. Based upon my observations of her candor, sincerity and demeanor, she is a very believable and sincere witness.

 Unlike White, Adam Colter was not a credible witness. When confronted with questions that undermined his position, Adam Colter was evasive and at times intentionally ambiguous. He clearly misled his readers with many of his posts. For example, he has not been an employer for over 30 years, yet in his Facebook posts he claims to have gone without pay so that his employees would get paid and would not lose their medical insurance. His Facebook home page claims that he owns US Ground Express. He does not. He testified that he is “strictly a consultant.” He is clearly very skilled in the handling of all aspects of computers and the use of social media, but when asked a simple computer question relating to administrative rights, he initially balked at answering it because a truthful answer would be helpful to the plaintiffs. Despite their apparent closeness, he claims not to be aware of many of the details associated with Jill’s illness or her employment.

 The testimony at the hearing did not specifically address whether plaintiffs are public figures, thus requiring a showing that the statements were made with malice, rather than negligently. There was absolutely no evidence that plaintiffs voluntarily injected themselves or were drawn into a particular public controversy thereby becoming a public figure in this matter. Gerts v. Robert Welch, Inc., 418 U.S. 323 (1974). For the purposes of this motion, I apply the higher standard notwithstanding the fact that it may not be met at trial.