**Willis N. BROWN, Jr., Plaintiff,**

**v.**

**HEARST CORPORATION d/b/a WCVB–TV Channel 5, Defendant.**

**Civ. A. No. 93–11601–JLT.**

United States District Court,
D. Massachusetts.

July 21, 1994.

Jay E. Robinson, Dallas, TX, Edwin M. Sigel, Dallas, TX, Elizabeth Croke, Law Offices of Mario Bozza, Boston, MA, for plaintiff.

Steven J. Comen, Goodwin, Proctor & Hoar, Boston, MA, Paul Christopher Walter, Stephen Edward Fox, Robert James Garrey, Jenkens & Gilchrist, Dallas, TX, for defendant.

## MEMORANDUM

TAURO, Chief Judge.

### I.

#### Background

On November 13, 1990, and again on August 15, 1991, defendant Hearst Corporation, doing business as WCVB–TV Channel 5 ("Channel 5"), aired "The Other Pilot's Wife" (the "Broadcast") on *Chronicle,* a television program with a newsmagazine format.[1] The Broadcast told the story of the March 1987 disappearance of Regina Brown ("Regina") from the small Connecticut town of Newtown. Regina's husband, plaintiff Willis N. Brown ("Brown"), asserts that the Broadcast improperly insinuated that he was involved in his wife's disappearance. Brown alleges four causes of action against Channel 5: false light, intentional infliction of emotional distress, slander and invasion of privacy.

Regina was an American Airlines flight attendant. Brown is an American Airlines pilot. The Broadcast's title, "The Other Pilot's Wife," refers to the coincidence that Helle Crafts, another flight attendant married to a pilot, disappeared from the same small town just a few months before Regina's disappearance. The Broadcast accurately reported that fragments of Mrs. Craft's body were found in the Housatonic River. Her husband, Richard Crafts, had evidently put her body through a woodchipping machine. He was subsequently convicted of murder. Regina's disappearance remains unsolved.

The Broadcast was divided into three segments. The first focused on the setting of Newtown, Mrs. Crafts' disappearance and her husband's conviction for murder, as well as the woodchipping machine he purportedly used to dispose of her body. In addition, the Brown's were presented, through a series of photographs, as a handsome couple with three lovely children, an attractive house and a seemingly upbeat lifestyle. This positive mood was shaken somewhat by the re-enactment of a telephone call from Regina to a

---

1. The videotape and the transcript of the Broadcast have both been reviewed by this court.

friend, Hope Lambert. In this call, Regina asked Ms. Lambert to telephone her at her parents' house in two days. Regina then prophesied that "if I'm not there by then, Willis will have done to me what he's promised to do to me." The segment also made clear that there was no forensic evidence tying Brown to Regina's disappearance.

The second segment devoted itself primarily to the investigation of Regina's whereabouts by the Newtown Police Department, and to the Brown's twenty-three day divorce trial which was held subsequent to Regina's disappearance. Finally, the third segment dealt mainly with Regina's parents who, having been awarded custody, were raising the Brown's three children in Texas.

The Broadcast was the brainchild of Channel 5's Mary Richardson ("Richardson"), a well-known journalist. Richardson narrated the story and interviewed those who appeared on camera.

In preparing the Broadcast, Richardson reviewed materials from the Brown's divorce trial, including trial briefs and the extensive opinion of the trial judge. She also examined the Newton Police file concerning Regina's disappearance and read the several newspaper articles on the subject.[2] In addition, Richardson interviewed various persons with knowledge about the Browns and Regina's disappearance.[3] She also attempted, unsuccessfully, to interview the plaintiff.

Brown asserts that the juxtaposition of his wife's disappearance with the story of Mrs. Crafts disappearance and murder, defames him by implying that his wife has also been murdered and that he is the killer.[4] Brown repeatedly points out that he has never been formally accused of any crime with respect to his wife's disappearance.

In response to Brown's complaint, Channel 5 has filed a motion for summary judgment asserting that "every statement of fact in the Broadcast ... is true, nondefamatory, and or privileged." Def.'s Mem.Supp.Mot.Summ.J. at 1. Specifically, Channel 5 claims that, 1) Brown's false light claim is not recognized in Massachusetts, 2) the Broadcast is privileged as a fair report of the Browns' divorce trial which took place after her disappearance, and 3) Brown proffers no evidence of negligence on the part of Channel 5.

Based on the undisputed material facts, this court makes the following findings and conclusions with respect to the several issues raised by Channel 5's motion.

## II.

### Applicable Standards

#### A. Choice of Law

On February 26, 1993, this case was removed from the Dallas County District Court to the Federal District Court of Northern Texas. On July 21, 1993, the case was transferred to this court.

When a case is transferred to a new venue pursuant to 28 U.S.C. § 1404(a), the choice of law rules of the transferor venue apply. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

---

**2.** The newspaper accounts of Regina's disappearance included: "The Other Pilot's Wife," written by Edward Ericson, "Missing Person," written by Tracy Breton, and "3 Sources Triggered Police Hunt For Remains of Regina Brown at Block Island Trailer Site," also written by Tracy Breton. Richardson spoke at length with the authors of these articles concerning their underlying investigation and research.

**3.** Specifically, Richardson interviewed: (1) Michael DeJoseph, Chief of the Newtown Police; (2) Detective Harry Naroian of the Newtown Police; (3) Richard LeMay, the retired former Chief of the Block Island, Rhode Island Police; (4) William McCombe, the Chief of Police of Block Island, Rhode Island; (5) Hope Lambert, a close friend of Regina's; (6) Judy Ames, a baby-sitter; (7) John Hiltenun, the Browns' marriage counselor; (8) Norman Voog, the counsel appointed to represent the Browns' minor children in the divorce trial; (9) Ernestine Fontenot, Regina's mother; (10) Sonny Fontenot, Regina's brother; and (11) Dwight Fontenot, Regina's brother. In addition, Richardson interviewed the aforementioned investigative reporters.

**4.** In addition to this broad assertion of improper insinuation, in his response to Channel 5's motion for summary judgment, Brown points to several statements from the Broadcast which he claims are false. The court, however, has only located one statement which is arguably false, defamatory, and material. This statement, regarding Brown's refusal to submit to a lie-detector test, is discussed below.

Accordingly, in this case, Texas choice of law rules apply. Texas has abandoned the traditional tort choice of law rule of *lex loci delicti* in favor of the "most significant relationship approach" set out in §§ 6 and 145 of the Restatement (Second) of Conflict of Laws. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420–21 (Tex.1984).

■ The Broadcast at issue here originated from Needham Massachusetts. It was shown in Massachusetts as well as in surrounding states. Any community reaction to the Broadcast would have originated in Massachusetts and the New England area. Based on these facts, and in concurrence with the understanding of both parties, the court will apply Massachusetts law as having the most significant relationship to the underlying issues.

### B. Standards for Summary Judgment

■ The court will allow a motion for summary judgment "if the nonmoving party does not adduce enough evidence to permit a reasonable trier of fact to find for the nonmoving party on any element essential to its claim." *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992). "The party with the burden of proof must produce more than a 'scintilla of evidence' on each element essential to its claim, thus affording the jury a nonconjectural basis for concluding that 'the fact to be inferred [is] more probable than its nonexistence.'" *Id.* 961 F.2d at 969 (*quoting Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 970–71 (1st Cir.1991)).

### C. The Applicable Law of Defamation

The court embarks on its analysis fully conscious of the important First Amendment principles evoked by this case.[5] And, as the Supreme Court did in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), this court must balance the

First Amendment's "vital guarantee of free and uninhibited discussion of public issues" with the "important social values which underlie the law of defamation." *Id.* 497 U.S. at 22, 110 S.Ct. at 2707 (citations omitted).

■ The court begins its analysis with plaintiff's allegation of slander.[6] "The elements of a libel case are a false and defamatory communication of and concerning the plaintiff." *McAvoy v. Shufrin*, 401 Mass. 593, 518 N.E.2d 513, 517 (1988) (*citing* Restatement (Second) of Torts § 558 (1977); further citations omitted). The Supreme Judicial Court has explained that "[a] statement is defamatory in the circumstances if it discredits a person in the minds of any considerable and respectable class of the community." *Milgroom v. News Group Boston, Inc.*, 412 Mass. 9, 586 N.E.2d 985, 988 (1992) (citations omitted). The Supreme Court, however, has made clear that, under the guarantees of the First Amendment,[7] a private plaintiff suing a media defendant for defamation must show some fault on the part of the publishing defendant. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). In Massachusetts the measure of fault that a private party must demonstrate is "that [the] defendant acted with negligent disregard for the truth in making the statement." *Ricci v. Venture Magazine Inc.*, 574 F.Supp. 1563, 1571 (D.Mass.1983).

### III.

#### Analysis

#### A. Alleged False Statements

■ After a thorough review of plaintiff's pleadings, the video and the transcript, this court has found only one material statement from the Broadcast that was arguably false. That statement was made by Richardson who, in her narration, asserts: "At first

---

**5.** The First Amendment provides in relevant part: "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I.

**6.** Initially, the court notes that because the allegedly offensive statements were fixed, recorded, and widely distributed in a television program, if defamation does exist in this case, it is libel and

not slander. *See* Restatement (Second) of Torts § 568A (1977) ("Broadcasting of defamatory matter by means of radio or television is libel, whether or not it is read from a manuscript.").

**7.** *See New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964) ("libel can claim no talismanic immunity from constitutional limitations").

[Brown] told police he would take a lie detector test, then he refused." Broadcast Transcript at 161.

Brown concedes that he initially agreed to take a polygraph test, but denies that he later refused to do so. In his deposition, however, Brown expressly admits that, in response to Newton Police Chief Michael DeJoseph's ("DeJoseph") question: "Have you given any more thought to the polygraph?," he stated: "It's too late for a polygraph." Brown Dep. at 268–69. Though Brown does not see this statement as a "refusal," this court disagrees. Brown's response was a clear expression of his unwillingness to undertake the suggested polygraph, whatever his motives or reasons for declining may have been.

### B. Juxtaposition of the Brown and Crafts Stories

■ The focus of Brown's complaint, however, is not on specific misstatements of fact but, rather, on his assessment of the impression that the Broadcast conveys when taken as a whole. Brown asserts that the manner in which the Broadcast is presented—specifically, the way in which his wife's disappearance is juxtaposed with the Crafts murder—conveys the message that Brown also murdered his wife and disposed of her body in some insidious fashion. Brown correctly notes that "[a] statement which expressly states or insinuates that the plaintiff is a criminal or participated in a criminal act is defamatory in proper circumstances." *Arsenault v. Allegheny Airlines, Inc.,* 485 F.Supp. 1373, 1378 (D.Mass.), *aff'd,* 636 F.2d 1199 (1st Cir.1980), *cert. denied,* 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981) (citations omitted). *See also Jones v. Taibbi,* 400 Mass. 786, 512 N.E.2d 260, 264 (1987) ("An imputation of crime is defamatory *per se.*") (*citing Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161, 165 (1975)).

■ In making his juxtaposition argument, Brown relies heavily on the case of *Mabardi v. Boston Herald–Traveler Corp.,*

347 Mass. 411, 198 N.E.2d 304 (1964) in which the placing of the plaintiff's photograph next to a newspaper story about others' alleged criminal conduct was deemed actionable. *Mabardi,* however, is clearly distinguishable from the facts here. In *Mabardi,* no connection was proffered between the use of the plaintiff's photograph and the offending story. Here, however, there was a legitimate public interest and concern with respect to the remarkable coincidence of two flight attendants who were both married to pilots disappearing from the same small Connecticut town within a few months of one another. These were legitimate news stories, in the public domain and of general public interest. Their mere juxtaposition in the same Broadcast did not, for that reason alone, defame the plaintiff.

### C. Alleged Defamatory Statements in the Broadcast

■ A review of the Broadcast's transcript reveals several statements which suggest the possibility that Regina was murdered[8] and that Brown was somehow involved in her death. They include the following:

> Police Chief DeJoseph: "I think that Mr. Brown knows more about the disappearance of his wife than he is letting on." Broadcast Transcript at 167.

> Regina's father: "I feel like if Regina's dead, [Brown] killed her. Or had her killed." Broadcast Transcript at 168.

> Regina's Mother: "If she's somewhere, Willis' got her somewhere cooped up somewhere, that's the way I feel about it." Broadcast Transcript at 168.

■ It is important to recognize that merely because no one in the Broadcast specifically asserts that "Mr. Brown killed his wife," does not, by itself, insulate Channel 5 from liability. It is well-settled that Massachusetts does not

require[ ] that there be direct and explicit language tending to discredit the plaintiff or imputing crime to him. Words, pictures

---

**8.** The statements that simply suggest the possibility that Regina Brown was murdered, but do not focus on the identity of the murderer, whether they are true or not, can not be defamatory to the plaintiff and, therefore, need not be reviewed here.

or signs, singly or in combination, understood as mankind in general would understand them, conveying such an imputation render the publication libelous. An insinuation may be as actionable as a direct statement.

*Mabardi*, 198 N.E.2d at 306 (internal citations omitted). *See also Mihalik v. Duprey*, 11 Mass.App.Ct. 602, 417 N.E.2d 1238, 1239 (1981).

█ The purportedly offensive statements or insinuations made in the Broadcast, however, are all couched in a speculative tone. A statement which cannot reasonably be interpreted as an implication of a factual assertion is protected. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). But simply couching a statement in terms of opinion does not dispel the factual implications that may be involved. *Id.* The rule that emerges from *Milkovich* is that a statement must be "provably false" in order to be actionable. *Id.*

█ In determining whether a statement is a factual assertion or, instead, an opinion, a court must examine its content in context, consider all the words used, give weight to any cautionary terms employed, and take into account all surrounding circumstances including the medium of dissemination. *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 612 N.E.2d 1158 (1993). This determination, however, "is [only] a question of law if the statement unambiguously constitutes either fact or opinion." *Aldoupolis v. Globe Newspaper Co.*, 398 Mass. 731, 500 N.E.2d 794, 796 (1986).

█ This court regards the allegedly offensive statements set forth above to be unambiguous classic expressions of opinion. It is clear that none of the speakers knows, or purports to know what happened to Regina, not even the Chief of Police who had the responsibility for investigating her disappearance. None of the statements can be interpreted as implying that there are additional facts known to the speaker to cause him or her to be suspicious as to Brown's involvement. To the contrary, they are on their face expressions of opinion based on

conjecture and speculation, as opposed to implicit factual assertion or foundation. For this reason, they are not actionable. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

### D. The Fair Report Privilege

Channel 5 raises the fair report privilege as a defense with respect to matters in the Broadcast that are not protected as being true statements or expressions of opinion.

█ Under the fair report privilege a journalist may report court testimony which injures another without determining whether that testimony is true, as long as the reporting is fair and accurate. *Jones v. Taibbi*, 400 Mass. 786, 512 N.E.2d 260, 266 (1987); *Ricci v. Venture Magazine Inc.*, 574 F.Supp. 1563, 1567 (D.Mass.1983). "The proper scope of the fair report privilege is a matter of law appropriate for summary disposition." *In genere v. American Broadcasting Companies, Inc.*, No. 81–2894–Z, 1984 WL 14108, at *1 (D.Mass. Sept. 18, 1984) (*citing Williams v. WCAU–TV*, 555 F.Supp. 198, 201 (E.D.Pa. 1983)).

█ In applying the fair report privilege, the court must ask two questions: (1) does the reported material reflect the subject of an official proceeding, and (2) is it "fair and accurate." *Sibley v. Holyoke Transcript–Telegram Publishing Co., Inc.*, 391 Mass. 468, 461 N.E.2d 823, 825–26 (1984). The first requirement is met here because the divorce trial clearly qualifies as an official proceeding. The court, therefore, turns to the question of whether the allegedly defamatory elements of "The Other Pilot's Wife" can be viewed as a fair report of matters contained in the Browns' divorce trial. To perform this comparative analysis, the court must consider what was said, and insinuated, at the trial. The court begins by examining the Memorandum issued by Judge Moraghan of the Danbury, Connecticut Superior Court.

On the second page of the Memorandum, Judge Moraghan states explicitly: "Counsel, in sometimes subtle and sometimes blunt explanation of [Regina's] absence, conjecture that she was the victim of some horrible fate at the hands of [her husband]." Memoran-

dum of Decision, Connecticut Superior Court (Apr. 22, 1988) (hereinafter the "Memorandum") at 2. Adding weight to these theories of foul play, Judge Moraghan later notes that "[i]t is also equally unanimous among all the witnesses that this lady would never voluntarily leave her children and certainly would never fail to communicate with them were she able to do so." Memorandum at 15.

Moreover, Judge Moraghan is not content to merely note that an allegation was made. Rather, the Judge summarizes additional testimony from which such a suspicion could reasonably be drawn. In describing the Browns' troubled and abusive relationship, the Judge writes:

> [Brown] had physically and mentally abused [Regina] and reduced her existence to a living nightmare. She is terrified of him. He has threatened to kill her and that threat has been disclosed to friends. Immediately prior to her disappearance, she requested that her closest friend call her mother and take certain action in the event that she had not communicated with her family on March 27. In the event that she still had not communicated with anyone within four days from the day of the phone call to that friend on March 25, she requested that friend to call the police as he (meaning Mr. Brown) could well have done what he had threatened to do to her. She confided in her friend that she did not want to be used as a punching bag any more. At the same time, he had threatened to kill her and had appeared at the family home one night with a piece of rope threatening to kill her and the children. The children have since told the grandparents of their father choking their mother and kicking her after she fell to the floor.

Memorandum at 11–12.

▆▆▆ Brown points out that Judge Moraghan explicitly refrained from making any definitive findings as to Regina's fate, because to do so "would be pure speculation." Memorandum at 2. But, the fair report privilege applies even if the report might induce

readers to reach derogatory conclusions that were never proven to be true. *Ricci,* 574 F.Supp. at 1572. And so, the Judge's reluctance to speculate as to Regina's fate would not preclude Channel 5 from doing so, relying on the fair report privilege, if the evidence presented at the divorce trial reasonably allowed for such speculation. The issue, therefore, is whether the overlap of the material presented at trial and in the Broadcast is sufficient to trigger the fair report privilege.

Describing the extent of the overlap that a court must find to apply the fair report privilege, the Supreme Judicial Court noted the following:

> In *MiGi [Inc. v. Gannett Massachusetts Broadcasters, Inc.,* 25 Mass.App.Ct. 394, 519 N.E.2d 283, 285 (1988) ], the [Massachusetts] Appeals Court indicated that a report need give only "a rough-and-ready summary that [is] substantially correct" in order to qualify for the fair report privilege. A statement is considered a fair report "if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced."

*Elm Medical Laboratory, Inc. v. RKO General, Inc.,* 403 Mass. 779, 532 N.E.2d 675, 678 (1989) (*quoting Williams v. WCAU–TV,* 555 F.Supp. 198, 202 (E.D.Pa.1983)).

▆▆▆ "The precise truth" of what transpired at the divorce trial—as indicated by Judge Moraghan's Memorandum—included assertions that Brown had threatened to kill Regina and that she feared that he would carry out those threats. At most, the Broadcast reflected the "gist" of these observations by the Judge.[9] As the court in *Jones* indicated, "should it be demonstrated that [the third party's] allegations were made public as part of an official statement . . ., the defendants would be privileged to report that statement." *Jones,* 512 N.E.2d at 267 (where the "official statement" was a statement by the police). This court concludes, therefore, that

---

9. An example of one such privileged statement from the Broadcast is Richardson's comment that "[Regina's] husband is the prime suspect." Broadcast Transcript at 152. Because the gist of

this statement had already emerged at the divorce trial, whether or not this statement is defamatory, it is protected by the fair report privilege.

the Channel 5 Broadcast was protected by the fair report privilege.

### E. Negligence

 But even if the Broadcast, and its non-opinion content, were not protected by the Fair Report Privilege, Brown could not prevail on his claim of defamation, because he has failed to demonstrate that Channel 5 "acted with negligent disregard for the truth in making the statement." *Ricci,* 574 F.Supp. at 1571. In its motion for summary judgment, Channel 5 carefully outlines the investigative steps that Richardson took in preparing the Broadcast. It asserts that her conduct was a model of journalistic integrity. This court, however, must only determine whether there is enough evidence to submit to a jury the question of whether Channel 5's conduct was unreasonable.

As has been pointed out, Richardson reviewed court documents, police files, and newspaper accounts relating to Regina's disappearance. In addition, she interviewed, or attempted to interview, all of the major players in this drama. Brown does not point to any specific negligent act on the part of Channel 5 in the preparation or production of the program, nor can the court discover any. In short, there is no evidence that Channel 5 acted with negligent disregard for the truth in preparing or presenting the Broadcast.

### F. The False Light Claim

As the Restatement (Second) of Torts describes it, the tort of false light exists where (a) someone is put in a false light that would be offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the matter. Restatement (Second) of Torts § 652E. Brown concedes, however, that in *Jones,* the Supreme Judicial Court stated that the tort of false light has not yet been adopted in Massachusetts. *Jones,* 512 N.E.2d at 270 n. 12. Brown notes, however, that the Supreme Judicial Court in *Jones* did not rule out the potential for its adoption.

 This court should not be the first to recognize a state cause of action, especially where there are alternative theories available. *Dayton v. Peck, Stow and Wilcox Co.,* 739 F.2d 690, 694 (1st Cir.1984) ("We must apply the law of the forum as we infer it presently, not as it might come to be."). With the important principles of the First Amendment clearly in mind, this court refuses to expand the existing restrictions on free speech by recognizing a claim for false light. Moreover, as the D.C.Circuit has stated, "a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion." *Moldea v. New York Times Co.,* 22 F.3d 310, 319 (D.C.Cir.1994) (citations omitted).

As an aside, the court notes that even if it were to recognize a claim for false light, Brown would still be unable to prevail on such a theory. Because the court has already concluded that Brown fails to present a triable issue with regard to negligence, he certainly does not demonstrate that Channel 5 acted with knowledge or in reckless disregard of the falsity of the Broadcast.

### G. Invasion of Privacy Claim

 Brown also alleges that the Broadcast constituted an invasion of his privacy in violation of Mass.Gen.L. ch. 214 § 1B. This court disagrees. The privacy statute provides in relevant part: "A person shall have a right against unreasonable, substantial or serious interference with his privacy." As has been discussed, the facts and insinuations which emerged from the Broadcast had already surfaced in the Browns' divorce trial, the police investigation, and in at least three newspaper articles. Accordingly, in addition to being privileged, the information with which the program dealt was in the public domain and was no longer private information. Brown, therefore, can not prevail on his invasion of privacy claim.

### H. Intentional Infliction of Emotional Distress Claim

 Brown's final claim is for intentional infliction of emotional distress. To prevail on this theory, a plaintiff must show that: (1) the actor intended to cause the distress or should have known it was a likely result of his conduct, (2) the conduct was extreme and

outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions caused the plaintiff distress, and (4) the distress was severe and of a nature that no reasonable person could be expected to endure it. *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976).

As the court has previously determined, Brown's proffer of evidence does not support his theory that Channel 5's conduct was negligent. It follows, therefore, that such evidence can not prove that Channel 5's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Fudge v. Penthouse Int'l., Ltd.,* 840 F.2d 1012, 1021 (1st Cir.) *cert. denied,* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). Accordingly, Brown's intentional infliction of emotional distress claim fails as well.

## IV.

### Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is ALLOWED.

An order will issue.