<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 97-2376

                        TONEY PENDLETON,

                     Plaintiff, Appellant,

                               v.

                   CITY OF HAVERHILL, ET AL.,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

       [Hon. George A. O'Toole, Jr., U.S. District Judge]

                             Before

                    Torruella, Chief Judge,
                                
                    Selya, Circuit Judge,
                                
            and Schwarzer,* Senior District Judge.
                                
                                

    Thomas J. Gleason for appellant.
    Stephen C. Pfaff, with whom Douglas I. Louison and Merrick and
Louison were on brief, for appellees.

September 1, 1998

                                
                                
_______________
*Of the Northern District of California, sitting by designation.

 SELYA, Circuit Judge.  This appeal presents a problematic
First Amendment question as to whether the plaintiff was a
"limited-purpose public figure" required to prove actual malice in
order to recover for defamation.  After careful consideration of
this, and other, issues, we reject the plaintiff's appeal.
I.  THE PREDICATE FACTS
 Plaintiff-appellant Toney Pendleton, an African American
in his mid-forties, hails from Haverhill, Massachusetts.  He is
well known in the community both because of his family ties and
because of his exploits as a high-school athlete.
                      A.  The Job Market.
 Starting in the late 1980s, Pendleton tried to land a
full-time teaching position in the Haverhill public school system.  
Although he worked as a substitute teacher from time to time, he
progressed no further.  In August 1993, he vented his frustration
to a reporter, Anita Perkins, who found considerable irony in
Pendleton's inability to secure a permanent teaching position  
notwithstanding a student-led outcry for a more diverse public
school faculty.  She wrote an article to that effect in the
Lawrence Eagle-Tribune, a newspaper serving the Haverhill area.  
See Anita Perkins, Black Teacher Has Grown Impatient Awaiting A
Chance, Eagle-Trib., Aug. 17, 1993, at 13.
 Perkins's article profiled Pendleton and described his
family, educational background, career aspirations, temporary
teaching assignments, and his trepidation that school officials
were not giving appropriate priority to minority hires.  Reflecting
on his experience as an African-American student in the Haverhill
schools, Pendleton was quoted as saying:  "Twenty years later
things are still the same."  He also was quoted as asking,
rhetorically:  "How can you expect a black child who is called a
'n_ _ _ _ _' to go to a white counselor and teacher with his
feelings?"  The article commented on the dearth of minority
teachers in the Haverhill schools, described some of the steps that
Haverhill had taken to increase minority representation within the
school system, and concluded with Pendleton's plaintive comment:  
"I'm tired of substitute teaching.  I just want a chance to show my
qualifications."
 That fall, Pendleton accepted a Haverhill-based position
as a vocational counselor with Jobs For Bay State Graduates, Inc.
(JBSG), a private, nonprofit organization.  JBSG counselors advise
public school students who do not plan to attend college about
career opportunities.  Pendleton held this job at the time of his
arrest.
                  B.  Arrest and Prosecution.
 On the evening of May 27, 1994, Pendleton parked his car
on a busy, well-lit street in his home town, ran some errands, and
then repaired to a local tavern.  At some point, Arnaldo Pagan, a
boyhood friend, asked Pendleton to give him a ride home.  After
Pagan grew increasingly insistent, Pendleton acquiesced.  The two
men then proceeded to Pendleton's automobile.  The vehicle was
still parked when two Haverhill policemen on routine neighborhood
patrol shined a flashlight into it.  The officers, John Arahovites
and Lawrence Newman, claimed that "two heads popped up" from behind
the dashboard and that they noticed a powdery substance on
Pendleton's face.  Upon further investigation, the officers
observed powder on Pagan's lap and throughout the car's interior.  
They also saw a small bag containing what appeared to be cocaine on
the floor of the vehicle.  Based on these observations, the
gendarmes promptly arrested Pendleton and Pagan.
 Pendleton's arrest made front-page news in both the
Eagle-Tribune and a competing newspaper, the Haverhill Gazette.  
The stories revealed that charges of cocaine possession and
conspiracy to violate the drug laws had been brought against
Pendleton in the state district court.  The articles described
Pendleton as a "school jobs counselor" and a "high school advisor"
who worked in a classroom five days a week with 30 to 40 high-
school seniors.
 Pendleton entered a not guilty plea.  At a court hearing
on July 12, 1994, he asserted that when Pagan, after entering his
vehicle, produced a small plastic bag, he (Pendleton) suspected the
bag contained drugs and slapped it out of Pagan's hand.  In turn,
this act caused the contents to spill onto Pagan's lap and scatter
throughout the car.  In responding to an unrelated inquiry from the
court, the prosecutor admitted that, due to a mix-up, the powder
seized from Pendleton's car had not been tested.  The judge
obviously did not like what he had heard.  He declared Pendleton
not guilty and dismissed the charges.
                     C.  Subsequent Events.
 A flurry of media reports followed the case's
termination.  In them, the district attorney's office accused the
police of bungling the investigation and the police chief responded
that delays in laboratory testing are sometimes an inevitable
concomitant of the evidence-gathering process.  As part of this
coverage, a local reporter interviewed Pendleton and his attorney.  
The lawyer theorized that Pendleton had been in the wrong place at
the wrong time, and that he now could "get back to doing . . .
positive things in the community," such as "helping kids."  Bill
Burke, Pendleton Tells His Side:  But Did Police Drop The Ball?,
Haverhill Gazette, July 14, 1994, at A1. Pendleton asserted that he
was "the happiest guy in America that my innocence has been borne
out."  Id.
 On July 18, the arresting officers responded to a call
from the Eagle-Tribune.  At the newspaper's offices, Arahovites and
Newman voiced indignation over the disposition of the charges,
emphasizing that they had not been notified about the July 12
proceeding and expressing disappointment that the judge had refused
to order Pendleton to undergo drug rehabilitation.  See Bill
Cantwell & Eileen Pendleton, Judge's Release Of Suspect Outrages
Police, Eagle-Trib., July 18, 1994, at 1.  The article quoted
Arahovites as saying that the police were "not trying to crucify
Pendleton," but "[t]hat guy should be in rehab right now."  Id.  
When arrested, Arahovites said, Pendleton "had coke all over his
face, from the tip of his chin to his eyebrows," unlike "[a] first-
time user [who] would not have had it all over his face."
 The same article reported Arahovites's claims that he had
"never made an arrest where there was this much cocaine on a
person's face," and that he had found "a big bag of cocaine at
[Pendleton's] feet."  Id.  Finally, the journalists noted
Arahovites's protest that the officers should not be held
accountable for Pendleton's predicament.  In Arahovites's words,
"[t]hese guys [Pendleton and Pagan] were doing cocaine and they got
caught.  Period."  Id.  Thus, despite the fact that Pendleton "was
fighting for a school department job" and "outside forces [were]
fighting for him to become a teacher," he had only himself to blame
if the negative publicity hampered his bid.  Id.
 On August 18, 1994, JBSG terminated Pendleton's
employment.
II.  THE PROCEEDINGS BELOW
 On December 19, 1995, Pendleton sued the city of
Haverhill, Arahovites, and Newman in the federal district court.  
In pertinent part, his complaint invoked 42 U.S.C.  1983 (1994)
and claimed that the officers' post-acquittal statements to the
press violated his constitutional rights.  The complaint also
alleged various state-law claims, including counts for defamation,
infliction of emotional distress, invasion of privacy, negligence,
negligent supervision, and malicious interference with employment
relations.
    After protracted pretrial discovery, the defendants moved
for summary judgment.  The district court, ruling from the bench,
granted brevis disposition (i) in Newman's favor on all claims,
(ii) in Arahovites's and the city's favor with respect to the
section 1983 claims, and (iii) exercising supplemental
jurisdiction, see 28 U.S.C.  1367(c), in the defendants' favor on
all other causes of action save for the defamation claim against
Arahovites.
    Trial on the surviving count commenced on October 27,
1997.  At the conclusion of the evidence, the court entertained
arguments as to whether Pendleton should be deemed a public figure,
and if so, to what extent.  Noting the nature of Pendleton's work
in the public schools, his stature in the Haverhill community, the
fact that charges against him were a matter of public interest, and
his willingness to "engage[] in th[e] process of communication in
the form of a newspaper interview, just as the defendant did," the
court concluded that Pendleton was a limited-purpose public figure
and instructed the jury accordingly.  The jurors returned a take-
nothing verdict.  This appeal followed.
    Pendleton now assigns error to the pretrial entry of
partial summary judgment, three evidentiary rulings that occurred
at trial, and the public figure status determination.  We address
his asseverations in accordance with these groupings.
III.  THE PRETRIAL RULINGS
    The district court granted summary judgment on seven of
the enumerated counts lodged in Pendleton's complaint.  Pendleton
does not challenge any of them as they pertain to Newman, but he
does challenge four of the rulings as they pertain to Arahovites
and Haverhill.  We review these determinations de novo, taking the
facts as they appeared in the summary judgment record in the light
most hospitable to Pendleton.  See Elliot v. S.D. Warren Co., 134
F.3d 1, 9 (1st Cir. 1998).
                  A.  The Section 1983 Claims.
    Section 1983 "provides a cause of action when an
individual, acting under color of state law, deprives a person of
federally assured rights."  Camilo-Robles v. Hoyos, ___ F.3d ___,
___ (1st Cir. 1998) [No. 97-2260, slip op. at 7].  Pendleton's
section 1983 claims hypothesize that Arahovites's scurrilous
statements to the press led JBSG to discharge Pendleton, thereby
depriving him of a liberty interest protected by the Due Process
Clause of the Fourteenth Amendment.
    The Supreme Court has determined authoritatively that
defamation, even from the lips of a government actor, does not in
and of itself transgress constitutionally assured rights.  See Paulv. Davis, 424 U.S. 693, 700-01 (1976) (establishing that although
state law may provide a remedy for defamatory statements uttered by
a government official, no cognizable constitutional harm ordinarily
occurs).  In an effort to avoid this holding and to state an
actionable section 1983 claim grounded upon defamation, Pendleton
strives to fit his case into the narrow category of situations that
involve more than simple stigmatization.  These precedents discern
a deprivation of a constitutionally protected liberty interest
when, in addition to mere reputational injury, words spoken by a
government actor adversely impact a right or status previously
enjoyed under state law.  See id. at 708-09; Rodriguez de Quinonezv. Perez, 596 F.2d 486, 489 (1st Cir. 1979); Dennis v. S & S
Consol. Rural High Sch. Dist., 577 F.2d 338, 341 (5th Cir. 1978).  
Because his case juxtaposes slanderous language and loss of
employment, Pendleton posits that it comes within this "stigma
plus" rubric.  The district court did not agree.  Nor do we.
    In the first place, to achieve a sufficient "plus" in a
loss-of-job context, words spoken must be "uttered incident to the
termination."  Siegert v. Gilley, 500 U.S. 226, 234 (1991).  Here,
however, the alleged defamation and the decision to cashier
Pendleton came from two separate, unrelated sources, and the former
cannot plausibly be said to have occurred "incident to" the latter.  
As such, the allegedly defamatory remarks cannot be viewed as
working a denial of a previously recognized right or status.
    In the second place, a violation of constitutional
proportions under a "stigma plus" theory exists only if, and to the
extent that, the opportunities lost are government benefices denied
as a result of governmental action.  See Paul, 424 U.S. at 708-09;
Rodriguez de Quinonez, 596 F.2d at 489.  Pendleton's claim founders
on these shoals:  he worked for a non-governmental employer and
lost a private (not a public) position.  Although JBSG receives
some financial assistance from the Commonwealth of Massachusetts
and operates within the public school system, it is not an arm of
the state.  See Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982).
    To the extent that Pendleton asserts section 1983 claims
apart from his claim that Arahovites deprived him of a liberty
interest, we dismiss them out of hand.  Some of these claims (e.g.,
his allegations that the officers falsified their reports and acted
out of racial animus) are simply unsupported by the evidence.  
Others (e.g., Pendleton's assertion that his federal civil rights
were violated because Arahovites spoke out in contravention of
departmental rules) are legally impuissant.  See, e.g., Snowden v.
Hughes, 321 U.S. 1, 11 (1944); Colon v. Schneider, 899 F.2d 660,
672 (7th Cir. 1990).  Finally, in the absence of individual
liability on any officer's part, Pendleton's counterpart section
1983 claims against Haverhill, as the officers' municipal employer,
cannot succeed.  See Pembaur v. City of Cincinnati, 475 U.S. 469,
480 (1986); Evans v. Avery, 100 F.3d 1033, 1039 (1st Cir. 1996),
cert. denied, 117 S. Ct. 1693 (1997).
                      B.  The Tort Claims.
    On appeal, Pendleton concedes the propriety of summary
judgment on many of his state-law tort claims, but challenges the
rejection of his claims for negligence, invasion of privacy, and
malicious interference with employment relations.  The subject
warrants scant comment.
    To prevail on a negligence claim under Massachusetts law,
a plaintiff must show (1) that the defendant owed him a duty, (2)
that the defendant breached the duty, and (3) that the breach
caused the plaintiff's injuries.  See Cannon v. Sears, Roebuck &
Co., 374 N.E.2d 582, 584 (Mass. 1978).  In this case, Pendleton
conclusorily attributed the loss of his employment to Arahovites's
remarks, but he did not produce evidence at the summary judgment
stage sufficient to permit a finding that these remarks prompted
JBSG to fire him.  Absent such evidence, his claim is untenable.  
See, e.g., Poskus v. Lombardo's of Randolph, Inc., 670 N.E.2d 383,
385-86 (Mass. 1996).
    Pendleton's malicious interference claim suffers from the
same defect.  And, moreover, Pendleton failed to proffer any
evidence related to another essential element of this claim; the
summary judgment record contains no proof that Arahovites knowingly
attempted to induce JBSG to act.  See G.S. Enters., Inc. v.
Falmouth Marine, Inc., 571 N.E.2d 1363, 1369 (Mass. 1991).
    The privacy claim is no more substantial.  Pendleton
never identified the specific statements that supposedly intrude
upon his privacy, nor can we glean the essentials of an actionable
claim from the summary judgment record.  Massachusetts law
prohibits unreasonable public disclosure of private information.  
See Mass. Gen. Laws. ch. 214,  1B; see also Bratt v. International
Bus. Mach. Corp., 467 N.E.2d 126, 134 (Mass. 1984).  But this does
not profit Pendleton because neither Arahovites's descriptions nor
perceptions of Pendleton's conduct in a public place constitute
private information.  See generally United States v. Dionisio, 410
U.S. 1, 14 (1973) (concluding that there is no reasonable
expectation of privacy in one's appearance); Brown v. Hearst Corp.,
862 F. Supp. 622, 631 (D. Mass. 1994) (explaining that there can be
no expectation of privacy vis--vis information that has already
filtered into the public domain), aff'd, 54 F.3d 21 (1st Cir.
1995); Whirty v. Lynch, 539 N.E.2d 1064, 1065 (Mass. App. Ct. 1989)
(sanctioning release of information pertaining to plaintiff's
criminal background).  The cases upon which Pendleton relies in his
struggle to reach a contrary result are plainly distinguishable
because they deal with quintessentially private information.  See,
e.g., Pressman v. Brigham Med. Group Found., Inc., 919 F. Supp.
516, 524 (D. Mass. 1996) (medical information); Gauthier v. Police
Comm'r, 557 N.E.2d 1374, 1376 (Mass. 1990) (toxicology results).
IV.  THE EVIDENTIARY RULINGS
    Pendleton challenges three evidentiary rulings.  Two of
these relate to the exclusion of evidence and the third relates to
the admission of evidence.  In each instance, we review the
district court's determination for abuse of discretion.  SeeWilliams v. Drake, ___ F.3d ___, ___ (1st Cir. 1998) [No. 98-1014,
slip op. at 5]; Blinzler v. Marriot Int'l, Inc., 81 F.3d 1148, 1158
(1st Cir. 1996).
                A.  Negative Drug Test Results.
    At trial, Pendleton sought to introduce evidence that he
tested negative for drugs on the Tuesday following his Friday night
arrest.  Arahovites objected on relevancy grounds.  Judge O'Toole
called counsel to the bench and asked Pendleton's lawyer what the
jury could conclude from this evidence.  Counsel replied that the
evidence tended to show that "he [Pendleton] doesn't have a drug
problem."  The judge then asked the lawyer:  "Is it evidence that
[Pendleton] did not ingest any amount of cocaine on Friday night?"  
The lawyer responded in the negative.  After a further colloquy,
the judge ruled that Pendleton could show "the fact of the test"
and that he voluntarily arranged for it, but not the results.
    We discern no misuse of discretion in the trial court's
exclusion of the test results.  Relevant evidence is "evidence
having any tendency to make the existence of any fact that is of
consequence to the determination of the action more or less
probable than it would be without the evidence."  Fed. R. Evid.
401.  Since   as Pendleton readily admits   a negative test result
on Tuesday lacks probative value as to whether Pendleton was using
cocaine on the previous Friday, the court did not abuse its
discretion in ruling that the test results were irrelevant to
Arahovites's statements about Pendleton's cocaine use on the night
of the arrest.  See, e.g., United States v. Levy-Cordero, 67 F.3d
1002, 1016 (1st Cir. 1995), cert. denied, 116 S. Ct. 1558 (1996);
United States v. Brandon, 17 F.3d 409, 444 (1st Cir. 1994); seealso Fed. R. Evid. 402.  
    In this venue, Pendleton embroiders his argument,
contending that he should have been allowed to introduce the
negative test results as evidence tending to disprove Arahovites's
general suggestion that Pendleton had a drug problem.  We disagree.  
Even if the officer's opinion could be construed as defamatory   a
matter on which we take no view, see Fudge v. Penthouse Int'l,
Ltd., 840 F.2d 1012, 1016 (1st Cir. 1988) ("If the challenged
statement is one of opinion rather than fact, then under the First
Amendment, it generally cannot give rise to a defamation claim.")
 the proffered evidence does not prove or disprove whether
Pendleton regularly used drugs.  At most, it establishes that
Pendleton had no drugs in his bloodstream at the time the test was
administered (and, perhaps, that he had not used drugs immediately
prior thereto).  These are topics that Arahovites did not broach in
his allegedly defamatory comments.
          B.  Police Department Rules and Regulations.
    Pendleton next challenges the trial court's decision to
exclude the testimony of Deputy Chief Shea, who Pendleton sought to
question about the Haverhill police department's rules regarding
dissemination of information to the press.  Pendleton offered
Shea's testimony to assist in establishing malice.  Specifically,
Pendleton's counsel told the court that this testimony would show
"how deeply [Arahovites] felt about [speaking out], how much he
wanted to do it, that he would violate all of these rules" against
talking to the press.
    This iteration of relevancy misapprehends the concept of
"actual malice" in defamation law.  In the defamation context,
"malice" does not relate to the defendant's motive for speaking, or
even to whether the defendant made the challenged statement out of
ill-will.  Rather, "malice" for this purpose requires proof that
the speaker published the statement with knowledge of its falsity
or with reckless disregard as to whether it was false.  See St.
Amant v. Thompson, 390 U.S. 727, 731 (1968); Milgroom v. News Group
Boston, Inc., 586 N.E.2d 985, 987 (Mass. 1992).  Pendleton did not
offer Shea's testimony for any purpose bearing on these issues,
but, rather, according to his offer of proof, in an endeavor to
link evidence of rule violations to Arahovites's motive for having
made the allegedly defamatory statements.  Motive, however, is not
an element of a defamation claim under Massachusetts law.  SeeMcAvoy v. Shufrin, 518 N.E.2d 513, 517 (Mass. 1988).  Hence, the
trial court properly sustained Arahovites's objection.
                 C.  The Second Bag of Cocaine.
    During Arahovites's direct examination, the following
snippet of testimony emerged:
    DEFENSE COUNSEL:  Do you know what evidence
    was obtained at the time of the arrest of Mr.
    Pendleton by you or Officer Newman?

    ARAHOVITES:  Yes.

    DEFENSE COUNSEL:  What was it?

    ARAHOVITES:  The bag of cocaine   there was
    one bag of cocaine that was found in the car
    that was charged to Mr. Pendleton, and there
    was another bag of cocaine that was found in
    the back seat of our police cruiser. . . .  
    There was another bag of cocaine that came
    from Mr. Pagan that was in the back seat of
    our cruiser.

Pendleton objected to this testimony on relevancy grounds and
argues here that evidence regarding the second bag of cocaine was
both irrelevant and prejudicial.  He is half-right:  the evidence
was irrelevant and the objection should have been sustained.
    Pendleton is also half-wrong:  the error was benign.  The
second bag of cocaine was mentioned to the jury only once.  In
that passage, quoted above, Arahovites made it crystal clear that
the second bag belonged to Pagan, not Pendleton.  This fact
dovetailed with   and arguably bolstered   Pendleton's assertion
that Pagan was the drug user and that he (Pendleton) was merely an
innocent bystander.  Under the circumstances, we conclude that the
error in permitting Arahovites's statement to stand was harmless
and does not warrant a new trial.  See United States v. Ladd, 885
F.2d 954, 957 (1st Cir. 1989); see also Fed. R. Civ. P. 61.
V.  THE STATUS DETERMINATION
    The principal issue on appeal concerns the correctness of
the lower court's determination that Pendleton was a limited-
purpose public figure.  Pendleton challenges both the judge's
authority to make this determination (rather than submit the
question to the jury) and the substance of the determination
itself.  We subdivide our analysis into three segments, plotting
the legal landscape and tackling Pendleton's procedural point
before grappling with the merits.
                    A.  The Legal Landscape.
    In an effort to strike a balance between First Amendment
freedoms and state defamation laws, our jurisprudence accords
decretory significance to the status of each individual plaintiff.  
Under the taxonomy developed by the Supreme Court, private
plaintiffs can succeed in defamation actions on a state-set
standard of proof (typically, negligence), whereas the Constitution
imposes a higher hurdle for public figures and requires them to
prove actual malice.  See Gertz v. Robert Welch, Inc., 418 U.S.
323, 342-48 (1974); New York Times Co. v. Sullivan, 376 U.S. 254,
283 (1964); Kassel v. Gannett Co., 875 F.2d 935, 938 (1st Cir.
1989); Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583,
586-88 (1st Cir. 1980).  We briefly summarize the evolution of the
law in this area.
    In 1964, the Court considered for the first time the
issue of "the extent to which the constitutional protections for
speech and press limit a State's power to award damages in a libel
action brought by a public official against critics of his official
conduct."  New York Times, 376 U.S. at 256.  Due in large part to
the "profound national commitment to the principle that debate on
public issues should be uninhibited, robust, and wide-open," id. at
270, the Court concluded that even falsehoods are entitled to some
constitutional protection when directed at public officials, seeid. at 282-83 & n.21.  Thus, the Constitution does not allow a
public official to recover damages for defamation unless he
establishes with "convincing clarity" that the defamatory
statements were published with "actual malice."  Id. at 285-86.
    Two years later, the Court found occasion to consider who
qualified as a "public official" for the purpose of applying the
New York Times rule.  In Rosenblatt v. Baer, 383 U.S. 75, 85
(1966), the Justices held that "the 'public official' designation
applies at the very least to those among the hierarchy of
government employees who have, or appear to the public to have,
substantial responsibility for or control over the conduct of
governmental affairs."  At base, the designation covers those
government employees in positions that "would invite public
scrutiny and discussion of the person holding [them], entirely
apart from the scrutiny and discussion occasioned by [any]
particular charges in controversy."  Id. at 86 n.13.
    During its next term, the Court extended the New York
Times rule to defamation cases in which the plaintiff, though not
a government official, was a "public figure."  Curtis Pub. Co. v.
Butts, 388 U.S. 130, 155 (1967).  The Justices considered public
figures to be those who "commanded sufficient public interest and
had sufficient access to the means of counterargument to be able to
expose through discussion the falsehood and fallacies of the
defamatory statements."  Id. (citation and internal quotation marks
omitted).
    After some short-lived experimentation, see, e.g.,
Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 43-44 (1971), the
Court settled on a defamation model that ties the constitutionally
required showing in a defamation action to the plaintiff's status.  
It contemplated that "public figure" status usually would arise in
one of two ways:  (1) when persons "assume[] roles of especial
prominence in the affairs of society," perhaps by occupying
positions of "persuasive power and influence," or (2) when persons
"thrust themselves to the forefront of particular public
controversies in order to influence the resolution of the issues
involved."  Gertz, 418 U.S. at 345.  The Court noted, however,
that not all public figures are equal:  an individual who achieves
"pervasive fame or notoriety," or otherwise comes within the first
category, is deemed a public figure for all purposes, whereas an
individual who dives headfirst into troubled waters, or otherwise
comes within the second category, "becomes a public figure only for
a limited range of issues."  Id. at 351.  That range is identified
"by looking to the nature and extent of an individual's
participation in the particular controversy giving rise to the
defamation."  Id. at 352.
                       B.  Judge or Jury.
    Turning from the general to the particular, we first mull
Pendleton's claim that Judge O'Toole usurped the jury's province by
making the public figure determination himself.  In addressing this
issue, we do not write on a pristine page.  The Rosenblatt Court
declared that "it is for the trial judge in the first instance to
determine whether the proofs show [the plaintiff] to be a 'public
official,'" 383 U.S. at 88, and it explained that ceding this
responsibility to the bench reduced the chance that jurors might
"use the cloak of a general verdict to punish unpopular ideas or
speakers," id. at 88 n.15.  Extrapolating from this pronouncement,
a number of federal courts (including this one) have treated First
Amendment status determinations as grist for the court's   not the
jury's   mill.  See, e.g., Lundell Mfg. Co. v. American Broad.
Cos., 98 F.3d 351, 362 (8th Cir. 1996), cert. denied, 117 S. Ct.
1470 (1997); Reuber v. Food Chem. News, Inc., 925 F.2d 703, 708
(4th Cir. 1991); Marcone v. Penthouse Int'l Mag. for Men, 754 F.2d
1072, 1081 n.4 (3d Cir. 1985); Rebozo v. Washington Post Co., 637
F.2d 375, 379 (5th Cir. 1981); Waldbaum v. Fairchild Publs., Inc.,
627 F.2d 1287, 1293 n.12 (D.C. Cir. 1980); see also Penobscot
Indian Nation v. Key Bank, 112 F.3d 538, 561 (1st Cir.) (describing
"public figure status" as presenting "a question of law,"
notwithstanding that it "necessitates a detailed fact-sensitive
determination"), cert. denied, 118 S. Ct. 297 (1997).
    Ignoring these authorities, Pendleton exhorts us to adopt
the more particularized interpretation of the Rosenblatt rule
explicated in Stone v. Essex County Newspapers, Inc., 330 N.E.2d
161 (Mass. 1975).  Using Stone as a talisman, he insists that a
court may make the public figure determination only if the facts
bearing thereon are uncontroverted.  Building on this foundation,
Pendleton then asserts that the public figure question in this case
should have been submitted to the jury because the parties
disagreed as to whether Pendleton injected himself into a public
controversy to such an extent that he became a limited-purpose
public figure.
    We reject Pendleton's importuning.  The principal problem
with his argument is that it assumes (wrongly, we believe) that the
question of whether a person is sufficiently entangled in a public
controversy to qualify him as a limited-purpose public figure is
for the jury.  That question is of constitutional dimension and,
thus, federal law controls.  Consistent with the federal precedents
assembled above, which illustrate that the status issue is treated
in federal defamation jurisprudence as a question of law, we hold
that the question of whether a defamation plaintiff is a public
figure is properly resolved by the court, not by the jury,
regardless of the contestability of the predicate facts.
    In this case, moreover, all roads lead to Rome.  The
record reveals complete accord as to who Pendleton was and what he
did and said both before and after the events of May 27, 1994.  
There is no conflict as to any material fact; the issue is whether
the discerned facts suffice to establish that Pendleton acted in a
way sufficient to make him a public figure for the purpose of this
defamation action (say, by previously achieving pervasive fame and
notoriety, or by injecting himself into a public controversy).  We
have no doubt that this archetypical legal question is exactly the
sort of inquiry that the Rosenblatt Court intended the judge to
handle.  Hence, the trial court did not err in ruling directly on
the public figure question.
                    C.  Pendleton's Status.
    We turn now to the efficacy of Judge O'Toole's
determination that Pendleton, although not a public official, was
a limited-purpose public figure.  As with other questions of law,
we afford plenary review to this determination.  See McCarthy v.
Azure, 22 F.3d 351, 354 (1st Cir. 1994).
    Some of the arguments advanced in support of the
proposition that Pendleton was a limited-purpose public figure are
canards.  It is by now apodictic that an individual's involvement
in a criminal proceeding   even one that attracts substantial
notoriety   is not enough, in itself, to ingeminate public figure
status.  See Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 168
(1979).  By like token, one does not become a public figure merely
by defending oneself publicly against accusations.  See Time, Inc.v. Firestone, 424 U.S. 448, 454 n.3 (1976); Foretich v. Capital
Cities/ABC, Inc., 37 F.3d 1541, 1558 (4th Cir. 1994).  Finally,
Arahovites's claim that Pendleton achieved pervasive fame as a
sports star at Haverhill High School two decades ago and retains
that celebrity to this day elevates hope over reason.  The passage
of time obviously diluted whatever fame the now forty-something-
year-old Pendleton had acquired during his adolescent heyday.
    These false starts notwithstanding, we glean from the
appellees' briefs and the trial court's bench decision several
other suggested bases on which the court's decision arguably might
rest.  Rather than canvassing the universe of possibilities, we
proceed directly to the strongest argument in support of this
determination, mindful that an appellate court possesses the power
to affirm a lower court's rulings of law on any independent ground
made manifest by the record.  See Polyplastics, Inc. v. Transconex,
Inc., 827 F.2d 859, 860-61 (1st Cir. 1987).
    In mid-1993, Pendleton effectively announced his
candidacy to become a permanent teacher within the Haverhill school
system.  He proclaimed as much in a newspaper story (entitled
"Black Teacher Has Grown Impatient Awaiting A Chance") that
featured him and his aspiration.  Although the record is bereft of
information regarding the genesis of this published profile, the
article speaks eloquently for itself.
    Its author, Anita Perkins, describes a school system
employing 480 full-time teachers, only 15 of whom are minorities,
to instruct 7,500 pupils, approximately 1,050 of whom are
minorities.  Perkins reports Pendleton's avowal that the Haverhill
school system, in which minorities account for 14% of the student
body but only 3% of the faculty, is not taking appropriate steps to
increase the number of minority instructors.  In Pendleton's
opinion, "school officials are not making minority hirings a
priority,"    a failing that he says leaves minority students
without suitable role models.
    The gist of the article is that Pendleton, a Haverhill
native with a degree from the University of Massachusetts and ample
experience working with Haverhill youths, should be given a
teaching opportunity.  Perkins discusses Pendleton's "lifelong
dream of teaching in the schools that gave him and his family so
much," and explains that, despite completing two years as a
substitute teacher in a Haverhill school, "three attempts to land
a really permanent position in the city schools failed."  The
article concludes with Pendleton's poignant lament:  "I am tired of
substitute teaching.  I just want a chance to show my
qualifications."
    In addition to conveying Pendleton's views, Perkins
reported that, following a recent spate of racially tinged
incidents at Haverhill High School, students of all hues "called
for more minority teachers, a recommendation school officials said
they would heed."  This, and similar statements in the article,
make it transparently clear that the racial attributes of the
teacher-pupil mix by then had become a matter of public concern.  
This circumstance possesses great significance for a First
Amendment analysis:  by granting an interview to Perkins and
lobbying for a permanent teaching post at a time when the racial
composition of the public school faculty had become a matter of
intense interest in the community, Pendleton invited public
scrutiny of the qualities that equipped him to teach in the
Haverhill school system.  Accordingly, he became a public figure
for that limited purpose.
    We base this conclusion, in part, on the case law
concerning candidates for public office.  Monitor Patriot Co. v.
Roy, 401 U.S. 265 (1971), involved a claim that a newspaper was
liable for erroneously reporting that a senatorial candidate was a
"former small-time bootlegger."  Id. at 266.  The candidate sued,
maintaining that he need not prove actual malice because he had
never held a public office.  The Court demurred, holding that
"publications concerning candidates must be accorded at least as
much protection under the First and Fourteenth Amendments as those
concerning occupants of public office."  Id. at 271.  In a
companion case decided the same day, the Court reiterated its
conclusion that candidates for public office   there, a candidate
for a position as a county tax assessor   fall within the purview
of the New York Times rule.  See Ocala Star-Mirror Co. v. Damron,
401 U.S. 295, 299 (1971).
    We believe that, by analogy, these holdings are
instructive in respect to the circumstances at bar.  Of course,
unlike the candidates in Monitor Patriot and Ocala Star-Mirror,
Pendleton was not running for an elected political office   but it
is at least arguable that if a person holds (or aspires to hold)
any public post which entails control over matters of substantial
public concern, then his qualifications for serving in that
capacity are likely to engender the type of public debate and
discussion that the First Amendment protects.  See Rosenblatt, 383
U.S. at 85-86.  After all, the Court's defamation jurisprudence
makes no distinction between government officials who are selected
by the voters and those who are selected in other ways, and logic
suggests that it is the status of the official, not the manner in
which he attains (or hopes to attain) the office, that is the key
determinant of the extent to which state defamation law can be
allowed to curb free discussion.
    Here, however, we need not rely solely on this rationale.  
The Perkins article leaves no doubt that an independent public
controversy existed within Haverhill regarding the need to increase
minority faculty representation and the adequacy of the measures
employed by school officials to that end.  Pendleton voluntarily
injected himself into this preexisting controversy in at least
three ways:  by making (and authorizing the publication of)
statements bearing on the issue; by airing his qualifications in a
manner calculated to suggest that hiring him would ameliorate the
problem; and by seeking to influence public opinion not only on the
desirability of more minority hires, but also on the virtues of his
own candidacy for such employment.  In short, when Pendleton
stated, "I just want a chance to show my qualifications," he
invited public debate both on the general issue of minority
representation and on the specific characteristics that made him
suitable (or not) for a teaching position.
    We think that this conclusion comports comfortably with
the teachings of Gertz.  Pendleton had "access to the channels of
effective communication," 418 U.S. at 344, as evidenced by the fact
that his arrest on cocaine charges made the front page of both the
Gazette and the Eagle-Tribune well prior to the uproar over his
exoneration.  Similarly, the Gertz Court's statement that "[a]n
individual who decides to seek governmental office must accept
certain necessary consequences of that involvement in public
affairs," among them, "the risk of closer public scrutiny than
might otherwise be the case," 418 U.S. at 344, informs our
assessment.
    To be sure, there may be a temporal dimension to any
"limited-purpose public figure" analysis.  Intuitively, one should
not become fair game for eternity merely by injecting oneself into
the debate of the moment.  Cf. Rosenblatt, 383 U.S. at 87 n.14
(hypothesizing that "there may be cases where a person is so far
removed from a former position of authority that comment on the
manner in which he performed his responsibilities no longer has the
interest necessary to justify [applying] the New York Times rule").  
The case law, however, tends to contradict this intuition.  SeeAlan Kaminsky, Note, Defamation Law:  Once A Public Figure Always
A Public Figure?, 10 Hofstra L. Rev. 803, 812-13 (1982) (collecting
cases).  Yet, we need not probe this point, for the temporal link
in this instance is more than adequate.  Perkins's article
espousing Pendleton's qualifications appeared in August 1993, less
than a year before the utterances that are the subject of this
suit.  There is no evidence that, in the interim, the controversy
about minority faculty representation had subsided or that
Pendleton had abandoned his quest for a permanent teaching
position.
    Under the circumstances, Pendleton became a limited-
purpose public figure whose alleged peccadilloes, even if falsely
portrayed, were fair game in the absence of actual malice.  
Consequently, those with information bearing on Pendleton's
qualifications for a teaching position should not be punished for
speaking out, absent evidence that they knowingly or recklessly
disseminated falsehoods.  It follows that, because Arahovites's
allegedly defamatory statements relate directly to Pendleton's
qualifications for the public position to which he aspired and by
extension to the controversy which swirled around that position    
a controversy into which Pendleton had thrust himself   the
district court correctly applied the New York Times rule.  Cf.Monitor Patriot, 401 U.S. at 277 (holding "as a matter of
constitutional law that a charge of criminal conduct . . . can
never be irrelevant to an official's or candidate's fitness for
office").
    Let us be perfectly clear.  Our conclusion here, as in
most public figure cases, is factbound and restricted to the
specific circumstances revealed in the record.  See Bruno &
Stillman, 633 F.2d at 589 (explaining that "particularized
determinations of public figure status are the rule").  We are
aware of the scholarly debate surrounding teacher status in the
defamation context, see generally Eugene C. Bjorklun, Are Teachers
Public Officials For Defamation Purposes?, 80 West Ed. L. Rep. 527
(1993); Richard E. Johnson, No More Teachers' Dirty Looks   Now
They Sue:  An Analysis Of Plaintiff Status Determinations In
Defamation Actions By Public Educators, 17 Fla. St. U. L. Rev. 761
(1990); Peter S. Cane, Note, Defamation Of Teachers:  Behind The
Times?, 56 Fordham L. Rev. 1191 (1988), and we leave that ramified
inquiry for another day.  To resolve the case at hand, it is
unnecessary for us to hold that teachers are public figures for all
purposes or that each and every applicant for a teaching post is to
be deemed a public figure.  What we do hold is that when an
individual freely comments on a community controversy that he views
as precluding his ascension to a government office (such as that of
public school teacher) and puts his qualifications into the public
realm in a manner that suggests that he is trying to influence
public opinion, he becomes a public figure for the purpose of
discussions regarding his fitness for the office.
    We need go no further.  Pendleton made himself a public
figure by voluntarily stepping into the midst of an ongoing
controversy and inviting the citizenry to judge his bid to become
a teacher.  Having extended that invitation, he assumed the risk
that the ensuing discourse might contain errors of fact   errors
for which the speakers, in the absence of a showing of actual
malice, could not be held liable.  Hence, the court below did not
err in requiring Pendleton to prove actual malice as an element of
his defamation action.

Affirmed.

</body>

</html>